# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| SYMBOINT SCIENCE, ENGINEERING AND CONSTRUCTION, INC.; ZURICH AMERICAN INSURANCE COMPANY a/s/o Symbiont Science, Engineering and Construction, Inc.; AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, a/s/o Symbiont Science, Engineering and Construction, Inc.; and STEADFAST INSURANCE COMPANY a/s/o Symbiont Science, Engineering and Construction, Inc., | : | Case No. 3:22-cv-04905-MAS-LHG |
| Plaintiffs, | : |  |
| vs. | : |  |
| GROUND IMPROVEMENT SERVICES, INC.; JOHN DOES 1-10, (fictitious parties) and ABC COMPANIES 1-10 (fictitious parties); GEOSTRUCTURES OF VIRGINIA, INC., | : |  |
| Defendants. | : |  |
| GROUND IMPROVEMENT SERVICES, INC. and GEOSTRUCTURES, INC., | : |  |
| Third-Party Plaintiffs, | : |  |
| vs. | : |  |
| GEOPIER FOUNDATION COMPANY, INC., and GZA GEOENVIRONMENTAL, INC., | : |  |
| Third-Party Defendants. | : |  |

## THIRD-PARTY COMPLAINT BY DEFENDANTS GROUND IMPROVEMENT SERVICES, INC. and GEOSTRUCTURES, INC. AGAINST GEOPIER FOUNDATION COMPANY, INC.

Defendants/Third-Party Plaintiffs Ground Improvement Services, Inc. ("GIS") and

GeoStructures, Inc. d/b/a GeoStructures of Virginia, Inc. ("GeoStructures," collectively with GIS, "Third-Party Plaintiffs"), by their undersigned counsel, for their Third-Party Complaint against Third-Party Defendants Geopier Foundation Company, Inc. ("Geopier") allege as follows:

## PARTIES

1. GIS is a corporation organized under the laws of the State of Delaware with its principal place of business located in Virginia.

2. GeoStructures is a corporation organized under the laws of the Commonwealth of Virginia with its principal place of business located in Virginia.

3. Upon present information and belief, Geopier is a corporation organized under the laws of the State of Georgia with its principal place of business located in North Carolina.

4. Upon present information and belief, Geopier is registered to do business in New Jersey and regularly conducts business in New Jersey.

## JURISDICTION

5. The Court has subject matter jurisdiction over Third-Party Plaintiffs' claims under 28 U.S.C. § 1367(a) because they are so related to the Plaintiffs' claims that they form part of the same case or controversy under Article III of the United States Constitution.

6. The Court has subject matter jurisdiction over Third-Party Plaintiffs' claims under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Third-Party Plaintiffs and Third-Party Defendants.

7. GIS is a citizen of Delaware and Virginia, GeoStructures is a citizen of Virginia, Geopier is a citizen of Georgia and North Carolina, and GZA is a citizen of Massachusetts.

8. Further, the Court has subject matter jurisdiction over Third-Party Plaintiffs' claims under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs.

## VENUE

9.      Venue is proper in this district under the doctrine of ancillary venue and pursuant to 28 U.S.C. § 1391(b)(2) and (b)(3) in that a substantial part of the events or omissions giving rise to the claim occurred in this district and that Third-Party Defendants are subject to personal jurisdiction in this district with respect to this action.

## FACTS

10.     GIS is a contractor that provides, among other things, ground improvement construction services.

11.     GeoStructures provides ground improvement design services to GIS.

12.     Geopier is a service provider that franchises certain rights pursuant to sublicensing agreements.

13.     Trenton Biogas, a food waste recycling and renewable energy company sought to build a food waste recycling and renewable energy facility in Trenton, New Jersey.

14.     Plaintiff Symboint Science, Engineering and Construction, Inc. ("Symbiont") was the design-build contractor for Trenton Biogas, and entered into a contract for the digester design, permitting and construction services on the project.

15.     On or about August 17, 2017, GIS and Geopier entered into a sublicensing agreement titled "Impact Pier Sublicensing Agreement." ("Sublicensing Agreement").

16.     A true and accurate copy of the Sublicensing Agreement will be filed under seal as Exhibit A.

17.     On or about January 30, 2018, GIS submitted Quotation/Contract No. 1 (the "Quotation") to Symbiont, offering to perform design and construction services for the installation of elements for foundation support for tanks at a facility owned by Trenton Biogas.

18.     A true and accurate copy of the Quotation is attached hereto as Exhibit B.

19.     On or about February 8, 2018, Symbiont and GIS entered a Subconsultant Professional Services Agreement ("Subconsultant Agreement") where GIS agreed to perform certain soil improvement design services.  The Quotation was incorporated into the Subconsultant Agreement.

20.     A true and accurate copy of the Subconsultant Agreement is attached hereto as Exhibit C.

21.     The Sublicensing Agreement states, in part, as follows:

> [Geopier] have developed, own and have exclusive rights to various technologies, know-how and intellectual property for the design, construction, testing and use of various kinds of foundation improvements and vertical soil stabilizing and reinforcement means known as the "Impact Pier System" …

22.     In their Sublicensing Agreement, Geopier granted a license to GIS to install and use Geopier's design methodologies.

23.     The Sublicensing Agreement provides that, upon request and for a fee, Geopier would perform "Quality Control services" – peer review services - of GIS's designs.

24.     Under the Sublicensing Agreement, GIS was also required to "purchase, construct, or lease all necessary Impact Pier apparatus including hoppers, mandrels, and tamper heads which comply with all of [Geopier's] standards and specifications."

25.     A "Symbiont/Subcontractor Change Order" ("Change Order") was signed by Symbiont on May 30, 2018, and by GIS on June 6, 2018.

26.     A true and accurate copy of the "Change Order" is attached herto as Exhibit D.

27.     GIS's design was performed in compliance with Geopier's design and construction requirements, was peer-reviewed by Geopier, and was constructed with the

equipment and methodologies directed by Geopier.

28.     The Sublicensing Agreement with Geopier also required GIS to include the

following note on plans that utilized Geopier designs:

> "THIS DRAWING CONTAINS INFORMATION
> PROPRIETARY TO THE GEOPIER FOUNDATION
> COMPANY, INC. AND ITS LICENSEES, AND IS BEING
> FURNISHED SOLELY FOR USE BY GROUND
> IMPROVEMENT SERVICES, INC. IN CONNECTION WITH
> THE PROJECT DESCRIBED ON THIS DRAWING.  THE
> INFORMATION CONTAINED HEREIN IS NOT TO BE
> TRANSMITTED TO ANY OTHER ORGANIZATION OTHER
> THAN THE PROJECT DESIGN TEAM UNLESS
> SPECIFICALLY AUTHORIZED IN ADVANCE, IN WRITING
> BY GEOPIER FOUNDATION COMPANY, INC. AND/OR
> GEOCONSTRUCTORS, INC. OR BY AN AUTHORIZED
> IMPACT PIER LICENSEE."

29.     The Sublicensing Agreement with Geopier also includes an indemnity obligation

of the Licensor, Geopier, where Geopier agreed to "defend, indemnify and hold harmless [GIS],

its affiliates…from and against any and all losses, damages, costs, expenses, liabilities,

obligations and claims of any and every kind…which [GIS] may at any time suffer or incur, or

become subject to, as a result of or in connection with…any failure of [Geopier] to carry out,

perform, or otherwise fulfill or comply with…this Agreement; or…any negligent act or omission

of [Geopier]…."

30.     Article VI of the Sublicensing Agreement, titled "OBLIGATIONS OF

LICENSOR" states, in relevant part, as follows:

> "F.   Indemnification by Licensor. Licensor shall defend,
> indemnify, and hold harmless Licensee, its affiliates, and their
> respective successors and assigns, officers, directors, employees,
> and other representatives (each, individually, a "Licensee
> Indemnitee," and collectively, "Licensee Indemnified Parties")
> from and against any and all losses, damages, costs, expenses,
> liabilities, obligations and claims of any and every kind,
> (including, without limitation, reasonable attorneys' fees)
> (collectively, "Claims") which Licensee Indemnified Parties any at

any time suffer or incur or become subject to, as a result of or in connection with:

(i)   any breach of the representations or warranties made by the Licensor in or pursuant to this Agreement;

(ii)  any failure by any Licensor to carry out, perform, or otherwise fulfill or comply with any covenant, agreement, undertaking, or obligation under this Agreement; or

(iii) any negligent act or omission of Licensor, its agents, contractors, servants, or employees (but not including any negligent act or omission of Licensee, or its agents, contractors, (other than Licensee), servants or employees)."

31.     The Sublicensing Agreement is governed and construed in accordance with the laws of the state of North Carolina.

32.     On or about October 12, 2022, Plaintiffs Symbiont, Zurich American Insurance Company a/s/o Symbiont Science, Engineering and Construction, Inc, American Guarantee and Liability Insurance Company a/s/o Symbiont Science, Engineering and Construction, Inc, and Steadfast Insurance Company a/s/o Symbiont Science, Engineering and Construction, Inc., filed a Second Amended Complaint against GIS and GeoStructures of Virginia, Inc.

33.     A true and accurate copy of the Second Amended Complaint is attached as Exhibit E.

34.     In the Second Amended Complaint, Plaintiffs allege causes of action including, but not limited to, malpractice, negligence, breach of contract, breach of express and implied warranties, and seek indemnification as well as other damages.

**COUNT ONE**
**BREACH OF CONTRACT**

35.     Third-Party Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

36.     Geopier is contractually obligated to defend, indemnify and hold harmless Third-Party Plaintiffs from and against all losses, damages, costs, expenses, liabilities, obligations, and claims in accordance with the terms of the Sublicensing Agreement.

37.     Geopier is contractually obligated to indemnify Third-Party Plaintiffs for costs, including but not limited to, reasonable attorneys' fees in accordance with the terms of the Sublicensing Agreement.

38.     Geopier is contractually obligated to indemnify Third-Party Plaintiffs for any breach of the representations or warranties made by Geopier pursuant to the Sublicensing Agreement.

39.     Third-Party Plaintiffs deny that they are liable to the Plaintiffs for the claims asserted in the Second Amended Complaint.

40.     However, if Third-Party Plaintiffs are liable to the Plaintiffs, such liability was caused, or contributed to, by the acts or omissions of Geopier.

41.     In accordance with Article VI of the Sublicensing Agreement, notice of indemnification obligations under the Sublicensing Agreement was delivered by Third-Party Plaintiffs to Geopier.

42.     Geopier has failed to defend and indemnify Third-Party Plaintiffs pursuant to the Sublicensing Agreement.

43.     Geopier is in breach of its obligations owed to the Third-Party Plaintiffs.

44.     Geopier is liable for any judgment that Plaintiffs obtain against Third-Party Plaintiffs in this action, plus all costs, losses, damages, expenses, liabilities, and obligations, including, but not limited to attorneys' fees.

45.     Third-Party Plaintiffs have suffered damages due to Geopier's breach.

**WHEREFORE,** Third-Party Plaintiffs demand judgment against Geopier for compensatory damages, attorneys' fees, costs, interest, and such other relief as the Court deems just and equitable.

## <u>COUNT TWO</u>
## <u>CONTRIBUTION</u>

46.     Third-Party Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

47.     Third-Party Plaintiffs deny that they are liable to the Plaintiffs for the claims asserted in the Second Amended Complaint.

48.     However, if Third-Party Plaintiffs are liable to the Plaintiffs, the damages allegedly sustained by the Plaintiffs resulted from the acts or omissions of Geopier.

49.     Pursuant to the Joint Torfeasors Contibution Law, N.J.S.A 2A:53A-1 and under the Comparative Negligence Act, N.J.S.A. 2A:15-5.1, Third-Party Plaintiffs demand contribution against Geopier.

50.     Alternatively, under the North Carolina Contribution Amongst Joint Tortfeasors Act, Third-Party Plaintiffs demand contribution against Geopier.

**WHEREFORE,** Third-Party Plaintiffs demand judgment against Geopier for Contribution, and such other relief as the Court deems just and equitable.

## <u>COUNT THREE</u>
## <u>INDEMNIFICATION</u>

51.     Third-Party Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

52.     Third-Party Plaintiffs deny that they are liable to the Plaintiffs for the claims asserted in the Second Amended Complaint.

53.     However, if judgment is awarded against the Third-Party Plaintiffs, Third-Party

Plaintiffs' liability, if any, was not morally culpable but was merely constructive, technical, imputed, or vicarious and that liability arose through the direct and primary liability of Geopier.

**WHEREFORE,** Third-Party Plaintiffs demand judgment against Geopier for all sums as may be found due against it in favor of the Plaintiffs, and such other relief as the Court deems just and equitable.

54.    Third-Party Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth herein.

55.    At all times Geopier owes Third-Party Plaintiffs a duty to use reasonable skill, care, and diligence in the performance of its work.

56.    Geopier breached its duty in its rendering of peer-reviewed services by providing equipment and methodologies to the Third-Party Plaintiffs.

57.    Third-Party Defendants deny that they are liable to the Plaintiffs for the claims asserted in the Second Amended Complaint.

58.    However, if damages are awarded against Third-Party Plaintiffs, they are due to the negligence of Geopier.

59.    Moreover, as a direct, proximate, and foreseeable result of the negligence of Geopier, Third-Party Plaintiffs sustained damages, including, but not limited to, substantial costs and expenses defending the lawsuit herein.

**WHEREFORE,** Third-Party Plaintiffs demand judgment against Geopier for compensatory damages, attorneys' fees, costs, interest, and such other relief as the Court deems just and equitable.

## <u>JURY DEMAND</u>

Defendants/Third-Party Plaintiffs Ground Improvement Services, Inc. and Geostructures, Inc., hereby demand a trial by jury on all issues.

BY: ***<u>/s/ John P. Morgenstern</u>***
   John P. Morgenstern, Esquire
   Michael T. Sweeney, Esquire
   1717 Arch Street, Suite 3910
   Philadelphia, PA 19103
   215-461-3300
   JMorgenstern@ohaganmeyer.com
   MSweeney@ohaganmeyer.com

   *Attorneys for Defendants/Third Party*
   *Plaintiffs, Ground Improvement Services, Inc.*
   *and GeoStructures, Inc.*

Dated: November 4, 2022

## <u>CERTIFICATE OF SERVICE</u>

I, John P. Morgenstern, Esquire, hereby certify that on the date set forth below, I did cause a true and correct copy of the foregoing Third-Party Complaint by Defendants Ground Improvement Services, Inc. and Geostructures, Inc. against Geopier Foundation Company, Inc. to be filed with the Court's ECF/PACER electronic filing system, where it was available for immediate viewing and download to all counsel of record.


BY: *<u>/s/ John P. Morgenstern</u>*
      John P. Morgenstern, Esquire
      Michael T. Sweeney, Esquire


Dated: November 4, 2022

# EXHIBIT A

# TO BE FILED UNDER SEAL

# EXHIBIT B

# Ground Improvement Services, Inc.

**PO Box 918**
**Purcellville, VA 20134**
**862-763-0468**
**klevins@geostructures.com**

# Quotation/Contract No. 1

To:                         Brian Till
                            Symbiont (Herein after referred to as Purchaser)
                            6737 W Washington St.
                            Milwaukee, WI 53214

Project Name:               Trenton Biogas
Location:                   Trenton, NJ
GIS Project No.:    7820 RI
Date:                       January 30, 2018


Bid Documents and Applicable Contract Specifications:
1.  Geotechnical Engineering Report, prepared by GZA, dated January 5, 2018.
2.  Scope of Work – Soil Improvements, dated July 13, 2016.
3.  Foundation Plan Sheet Nos. D-020-S-100, D-020-S-500 prepared by AMEC Foster Wheeler, dated July, 11, 2016.
4.  Structural Drawing Nos. D-000-M-100; D-000-S-010; D-000-S-012; D-000-S-100; D-000-S-101; and D-000-S-500, dated July 11, 2016.
5.  Trenton Biogas Proposal Refresh – Full Proposal Layout by Disc: 18-April-17 Preliminary

This quotation will expire at midnight on the 20th day after the date of this letter unless signed by the Purchaser and received by Ground Improvement Services, Inc. (herein referred to as Subcontractor) prior to the expiration date.  The date of Subcontractor's receipt of the quotation signed by the Purchaser is the "Effective Date" of the Contract.   Subcontractor may withdraw, assign or modify this quotation by notifying the Purchaser prior to the Effective Date.   The pricing contained herein is based on all work being completed within 30 days after the Effective Date unless otherwise agreed to in writing.  The terms and price adjustment needed for work performed more than 30 days after the Effective Date will be reflected in a written change order executed prior to Subcontractor beginning or continuing work.  This Quotation is predicated on the terms and conditions contain herein.  Once signed by Purchaser, this Quotation and the terms and conditions set forth below will become the final, binding contract between the parties for the work identified in this Quotation.  In the event that this Quotation is not agreed to as the final contract between the parties and/or these terms and conditions are not incorporated into the final agreement between the parties, Subcontractor's price as reflected herein shall not be binding and Subcontractor shall be afforded an opportunity to revise its price to reflect the modified terms of the parties' agreement.

1.  **SCOPE OF WORK -** This contract is based on the installation of Rigid Inclusion (RI) elements for foundation support for the proposed Digester Tanks T-12100, T-12200, and T-12300 and Digester Buffer Tank T-10400. **RI elements will be installed in such a manner that no pad will need to be placed between the top of element and the bottom of footing.  See Figure 1.**

    1.1  Design services as part of this contract will be provided by a professional engineer (P.E.) licensed in the State of New Jersey.

    1.2  Mat foundation support for the proposed Digester Tanks and Buffer Tank is included in this pricing. Design loads are based on the Allowable Bearing Pressures given in Section 01 10 29 – Scope of Work – Ground Improvements. Confirmation of actual loads (i.e.,kips/sqft for supported mat foundations) shall be provided by others for final RI design.

**1.3**   RI elements shall be designed for settlement control due to compressive vertical loading only.  Footing uplift, sliding resistance, and any transient loading should be verified by others.

1.4   All RI elements are assumed to fully penetrate the uncontrolled fill as depicted in the Geotechnical Engineering Report/Soil Boring Logs and terminate in natural soil.

**1.5**   Total post construction settlements will be designed in accordance with the contract drawings, specifications, and addendum.

**1.6**   It has been assumed that there are no new or existing utility conflicts. Subcontractor shall be responsible to contact New Jersey 811 prior to RI installation. All other utility location shall be by others. Location and coordination of all proposed underground construction, including but not limited to utilities, shall be by others such that construction activities shall not damage installed RI elements and that RI elements are not in conflict with previous underground construction activities.

**1.7**   Grading coordination will be required so that the site shall be provided to Subcontractor at approximately existing grade, or at an elevation that requires no more than three feet of overburden drilling (as measured from bottom of footing).

**1.8**   Installation will take place for all RI elements during one mobilization and the sequence of operations shall allow for continuous RI installation. Additional mobilizations required by others can be provided at the unit rate below.

**1.9**   Union labor will be utilized for the construction of this project. A master mechanic and/or lead operating engineer is not included and shall be supplied by others if local labor agreements require them.

**1.10** One (1) modulus test shall be performed to confirm RI design parameters.

**1.11** Purchaser/Owner shall advise subcontractor of any site environmental hazards (surface or subsurface) which could affect personnel and/or RI installation procedures and shall coordinate with subcontractor to develop an appropriate health and safety plan prior to work start-up if hazards are known to exist.

**1.12** Adequate horizontal and vertical clearance shall be provided by others for the duration of the work. All demolition, debris removal, removal or mitigation of any interference with Pier installation such as powerlines, building overhangs, signs, above or below ground utilities and structures, underpinning, support of excavation operations existing construction, etc., or interference of, or caused by, existing structures shall be completed by others prior to Subcontractor mobilization. Purchaser is responsible for all additional performance costs and/or additional performance time resulting from site conditions that materially affect Subcontractor's work.

**1.13** Project site shall be available to subcontractor between 7am and 5pm, Monday through Saturday so that it may optimize manpower and equipment utilization as required for timely completion of work. **It is expected that installation of RI elements for mat foundation support will take approximately 21 working days (after mobilization and installation of modulus test piers).**  Schedule durations provided are approximate and do not include any add alternate work provided below. Installation shall commence after completion of modulus test. Production rates provided are in accordance with a standard 5-day, 40-hour week. Additional hours, beyond a 40-hour work week, required due to no fault of this subcontractor may be subject to additional cost.

**1.14** Subcontractor shall consolidate drill spoils (if pre-drilling or spoil generation is required) at a mutually agreed upon location on site within 100 feet of RI installation location.

**1.15** No additional insurance or schedule restrictions for railroad proximity are included in this proposal. GIS reserves the right to adjust pricing should any railroad restrictions apply to this work.

**1.16** Subcontractor shall install RI elements to design depth, or refusal on suitable material.

**1.17** Elevations were not provided on the Boring Logs, it was assumed that they were all taken from current elevation and that the proposed/existing elevation is the same.

**2.   CONTRACT AMOUNT –** is based on a lump sum as follows:

| | |
|---|---|
| Engineering | $    47,800 |
| Mobilization | $    52,000 |
| Modulus Test | $    17,000 |
| Installation of Digester Tanks (3) RI elements | $  418,360 |
| Installation of Buffer Tank RI elements | $    63,750 |
| **TOTAL CONTRACT AMOUNT =** | **$  598,910** |

**The following alternates are also provided:**

| | |
|---|---|
| Additional Mobilizations: | $   52,000   per each |
| Standby time for delays caused by others: | $     1,760  per crew hour |
| Bond: | 1.7% of Total Contract Amount |

**Engineering Rates (only as authorized by Purchaser):**

| | |
|---|---|
| Principal | $ 175 per hour |
| Professional Engineer | $ 125 per hour |
| Staff Engineer | $  85 per hour |
| CAD Support | $  75 per hour |
| Administrative Support | $  50 per hour |

**3.   PAYMENT TERMS** – Purchaser shall pay Subcontractor in full within thirty (30) calendar days of invoice date for all properly completed work for which payment is invoiced.  Retention, if any, is due 45 calendar days after Subcontractor has properly completed all contracted work provided that Owner has accepted all Subcontractor's work and all required paperwork and documentation has been submitted prior to the 45th day.  Retention will not be withheld on Engineering services, bond fees or materials broken out separately in the Schedule of Values.  Such materials must be paid for 30 days after delivery to the project site regardless of the pay application cycle. A service charge of 1-1/2% per month is due on any payments not made within thirty days of the invoice date.  On phased projects or Owner/GC-delayed projects, retention shall not be withheld beyond 45 days after Subcontractor has demobilized from the site. The cancellation of Purchaser's contract with Owner will not relieve Purchaser's obligation to pay for completed work.

**4.   ADDITIONAL WORK** – Unit prices where applicable shall apply to all extra work performed beyond the original Contract Amount quantities per Section 2 above, if such work can be performed at the same time Subcontractor is working at the site on the original quantities.  Subcontractor reserves the right to renegotiate any unit prices if it must move equipment back to the site to perform any extra or additional work without prior price agreement. Subcontractor is under no obligation to perform any extra or additional work without prior price agreement.  Subcontractor is entitled to an equitable adjustment in the contract price and/or the time available to perform the work as a result of site or subsurface conditions, including modulus test values, that differ from those reflected in the soil test borings or the Project Geotechnical Report or from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the contract. Additional design work will be performed in accordance with the unit rates in paragraph 2 above as directed. Additional engineering expenses will be billed at cost plus 10%. Once the Purchaser supplies Subcontractor with an executed Change Order for additional work, Purchaser is obligated to pay Subcontractor for all properly completed work covered by the executed Change Order per the terms and conditions of Section 3.

**5.   EXCLUSIONS (to be provided and paid for by others):**

**5.1 Access to the site for wheeled and tracked equipment, provide a level, stable working platform, safe site and access ramps, if required (into and out of the excavation), trafficable for Subcontractor equipment, and a water source on-site within 100 feet of the work area shall be provided by others for the duration of the work.**

**5.2** Any existing foundation elements, such as drilled shafts, piles, continuous or spread footings, etc., shall be located and surveyed by others. The locations shall be provided to the RI designer of record for coordination with RI locations where possible.  If an existing foundation element is in conflict with a RI

element that is unable to be relocated, the existing foundation element (pile, etc.) shall be removed by others to a depth of 3 feet below bottom of the RI element.

5.3 The removal of any underground or above ground obstructions or unsuitable materials, unable to be augured through, that inhibit or prevent RI installation using the usual RI foundation installation equipment shall be performed by others and controlled fill shall be placed in accordance with the project specifications in a timely manner, and the records shall be provided to the RI designer of record. Unsuitable materials include but are not limited to cobbles, muck, buried concrete, pipes, utilities, boulders, debris, stumps, logs, or trash. Should obstructions or other delays to work caused by others prevent RI installation from proceeding in a continuous manner, then Subcontractor shall be reimbursed at the crew rate listed in this Quotation (eight-hour minimum per work day) for delay.

5.4 Proper site drainage and dewatering shall be maintained by others, as necessary, for the duration of the work.

5.5 The center of all RI elements shall be surveyed and staked by others.  This shall include furnishing existing ground surface elevations on one stake for each isolated footing and at 25-foot intervals within continuous footings.

5.6 Any new fill (including fill that is placed as part of utility excavation(s)) shall be placed by others and shall be comprised of readily penetrable material, free of obstructions, and capable of staying open during drilling without sidewall collapse, unless otherwise agreed to in writing. All new fill shall be compacted in accordance with the project plans and specifications.  Settlement of new fill shall be complete prior to RI installation. Placement of any open-graded fill prior to RI element installation, including but not limited to utility backfill, shall be coordinated by the Purchaser with subcontractor prior to placement.  All fill placement and compaction records and any settlement monitoring data shall be provided to the RI subcontractor under a sealed, signed earthwork completion letter from the Geotechnical Engineer of Record prior to mobilization by the RI subcontractor.  The completion letter shall state that: all earthwork has been performed in accordance with the project plans and specifications, any settlement as a result of fill placement is complete, and RI construction can proceed.

5.7 Any required environmental remediation, handling, or disposal of contaminated spoils shall be by others.

5.8 Excavation for footings, exposing RI tops, and properly compacting excavation subgrades and RI top surfaces in accordance with the RI designer of record's requirements.

5.9 Adequate staging areas for equipment setup, maintenance, and breakdown, project administration, and portable toilet facilities on site shall be provided by others.

5.10 Purchaser recognizes that RI elements are part of a patented system protected under U.S. Patents and other patents pending.  All information furnished regarding RI and RI technology is specifically provided to the Purchaser for the purpose of using on this project only and shall not be transmitted to any other organization. No license is being granted to Purchaser by this agreement.

5.11 All drawings of the project foundation plan(s) and any other related drawings necessary to complete the design contracted for in this agreement shall be provided in electronic AutoCAD .dwg  format by others, and at no charge to Subcontractor.  If required drawings are not supplied in a timely manner by the Purchaser, Subcontractor shall draft the necessary plans from available information and charge Purchaser the cost of such work.

5.12 Maintenance of traffic and/or dust mitigation measures and/or street cleaning of any kind shall be provided by others for the duration of the work.

5.13 Reuse, loading, and/or removal of drill spoils from the site shall be by others.  Approximately 200-400 cubic yards of spoils is expected to be generated by this work which Subcontractor will stockpile onsite within 100 feet of the RI work area for use or disposal by others.

5.14 An area to stockpile aggregate large enough to store a minimum of 120 tons shall be provided by others within 100 feet of RI installation areas.

**5.15** Any 3rd party QA/QC testing or inspection fees, permits, preconstruction surveys, and/or related noise and/or vibration monitoring, shall be by others if required.

**5.16** Any project related Liquidated Damages are excluded.

6. **LIMIT OF LIABILITY -** Subcontractor's liability for any claims of any nature whatsoever, whether based upon contract, tort, or any other theory of recovery, arising out of or relating to this Agreement shall be limited to no more than the amount of this Quotation.  Subcontractor shall have no liability for any amounts in excess of the price of its Quotation, irrespective of the basis for any such claim.

It should be understood that while RI elements will act to improve footing bearing soils, RI elements will not prevent or limit sinkhole formation if conditions for sinkhole activity currently exist or are created in the future. Thus, Subcontractor expressly rejects any and all liability for any and all damages incurred as a result of sinkhole activity associated with this project.

7. **INDEMNIFICATION -** Subcontractor agrees to indemnify and save Purchaser harmless from any loss, cost or expense claimed by third parties for property damage and bodily injury, including death, caused solely by the negligence or willful misconduct of Subcontractor, its agents, employees or affiliates in connection with the Work.

Purchaser agrees to indemnify and save Subcontractor harmless from any loss, cost or expense claimed by third parties for property damage and bodily injury, including death, caused solely by the negligence or willful misconduct of Purchaser, its agents, employees or affiliates in connection with the Work.

If the negligence or willful misconduct of both Subcontractor and Purchaser (or a person identified above for whom each is liable) is the sole cause of such damage or injury, the loss, cost and expense shall be shared between Subcontractor and Purchaser in proportion to their relative degrees of negligence or willful misconduct and the right of indemnity shall apply for such proportion.

8. **DISPUTES –** Any and all claims, disputes, issues, and matters in question arising out of or relating to this Agreement, including arbitrability, shall be resolved exclusively and finally by binding arbitration conducted in accordance with the Construction Industry Rules of the American Arbitration Association ("AAA").  The Parties intend this to be a broad arbitration clause and to invoke the presumption in favor of arbitrability as to any ambiguities that may appear in this clause.  Issues subject to arbitration include, but are not limited to, the following: (a) disputes relating to the existence, validity, interpretation, scope, performance, or enforceability of the Agreement; (b) any statutory, tort, or common law claims that may be asserted concurrently or independently of the Agreement; and (c) any dispute as to arbitrability.  Any arbitration conducted in accordance with this clause shall be conducted in Fairfax or Loudoun County, Commonwealth of Virginia.  The award of the arbitrators shall be final, and judgment on the award may be entered by any court having jurisdiction to do so.  Costs incurred in the arbitration proceeding, including attorneys' fees and expenses, shall be borne by the prevailing party as determined by the arbitration panel.

As evidenced by the signatures affixed hereto, this Quotation/Contract is accepted according to the terms and conditions stated herein:

| Ground Improvement Services, Inc. | Symbiont |
|---|---|
| By: _____ <br> (Signature) | By: _____ <br> (Signature) |
| Name: _____ <br> (Print or Type) | Name: _____ <br> (Print or Type) |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

# FIGURE 1 – RIGID INCLUSION SUPPORT DETAIL



# EXHIBIT C



*FORM SDB-3 02-2016*

**SYMBIONT® DESIGN-BUILD, LLC**
**SUBCONSULTANT**
**PROFESSIONAL SERVICES AGREEMENT**

THIS AGREEMENT is entered into this 8th day of February, 2018, by and between Symbiont Design-Build, LLC (Symbiont) and Ground Improvement Services, Inc. (Subconsultant).

WHEREAS, Symbiont has entered into a written agreement, (the Contract) with Trenton Biogas, LLC (the Owner) for Digester Foundation Design and Permitting Services (the Project).

WHEREAS, Subconsultant represents that it can provide soil improvement design services, described in the Scope of Work of Attachment 1.

Symbiont and the Subconsultant have agreed that the Subconsultant will perform the following services, which are part of the Contract identified above. The services covered by this Agreement will be performed in accordance with the provisions included within this form and any attachments or schedules.

**Article 1. Scope of Work**

Subconsultant shall perform the services, specified in the Scope of Work section of Attachment 1, which are reasonably necessary and appropriate for the effective and prompt fulfillment of the Subconsultant's obligations under this Agreement. The relationship between the Subconsultant and Symbiont created under this Agreement is that of principal and independent contractor. Services provided by the Subconsultant shall be subject to the provisions of this Agreement including these general conditions, and supplemental conditions incorporated herein, and any written amendments agreed to by both parties.

Symbiont may adjust the Scope of Work by either adding to or deleting from the services to be performed. If such adjustment increases or decreases the cost or time required for the Subconsultant's Scope of Work, adjusted compensation and/or time will be mutually agreed upon in writing. Additional services provided by the Subconsultant will be entitled to additional compensation or extension of time only as authorized in writing by Symbiont. (See Article 24. Change Orders.)

**Article 2. Compensation**

Symbiont shall pay the Subconsultant for work performed under this Agreement in accordance with the provisions described herein and in the Compensation section of Attachment 1.

Subconsultant shall submit invoices to Symbiont in accordance with the Compensation section of Attachment 1 and no more frequently than monthly unless called for in Attachment 1. Invoices shall be submitted to the attention of Symbiont's project manager indicating the project number noted on Attachment 1 at the following address:

> Symbiont
> 6737 West Washington Street, Suite 3440
> Milwaukee, Wisconsin 53214

Following Owner's payment to Symbiont, payment will be made by Symbiont to Subconsultant within 15 days for the approved invoice amount. Subconsultant invoices received after the 5th of the month will not be invoiced to Owner until the middle of the following month, which may result in delay in payment. If Symbiont objects to all or any portion of an invoice, Symbiont shall so notify the Subcontractor within fourteen (14) calendar days of the invoice date, identify the cause of disagreement, and pay when due that portion of the invoice, if any, not in dispute. In the event that Symbiont and the Subconsultant cannot resolve the dispute regarding invoiced amounts within thirty (30) days (or in a time frame mutually agreed to by both parties) after receipt by the Subconsultant of the aforementioned notice, the dispute shall be submitted to dispute resolution pursuant to Article 11, below.

Symbiont may, at its sole discretion, withhold payment to Subconsultant for failure of Subconsultant to provide a Certificate of Insurance pursuant to Article 13 below. Symbiont may withhold or offset payment to Subconsultant for failure to provide all lien waivers and other documents pursuant to Article 16 below.



FORM SDB-3 02-2016

**Article 3.  Confidentiality**

Symbiont and Subconsultant shall hold confidential all business or technical information obtained from the other or its affiliates or Client/Owner under this Agreement for a period of five (5) years after obtaining such information, and during that period shall not disclose such information without the disclosing party's consent except to the extent required for (1) performance of services under this Agreement; (2) compliance with professional standards of conduct for preservation of the public safety, health and welfare; (3) compliance with any law, regulation, ordinance, subpoena, court order or governmental request; or (4) protection of the disclosing party against claims or liabilities arising from performance of services under this Agreement.  In the event disclosure may be required for any of the foregoing reasons, the disclosing party will, except where immediate

notification is required by law or regulation or is, in the judgment of Symbiont's counsel required to limit Symbiont's liability, notify the other party in advance of disclosure.  The parties' obligations hereunder shall not apply to information in the public domain or information lawfully acquired on a non-confidential basis from others.

**Article 4.  Independent Contractor Relationship**

The Subconsultant shall serve as an independent consultant to Symbiont and shall have control over and be responsible for the means and methods for providing services under this Agreement.  Nothing contained in this Agreement will create any contractual relationship between the Owner and Subconsultant.

The Subconsultant acknowledges and agrees that it will not be an agent of Symbiont and will not have nor represent or hold itself, or allow any of its employees, agents, or Subconsultants to represent or hold itself or himself, out as having authority to bind Symbiont or to incur any obligation whatsoever on behalf of Symbiont.  Symbiont shall not be liable to any party in any way for any engagement, obligation, commitment, contract, representation or transaction or any act or omission to act of the Subconsultant as provided in this Agreement.

**Article 5.  Representation and Warranty**

The Subconsultant represents and warrants to Symbiont that the Subconsultant is experienced in the provision of the services to be performed under this Agreement and that such services shall be of a quality and a type usually and customarily provided by Subconsultants performing similar services in and around the locale of the project site.

If under this Agreement the Subconsultant performs any design services, Subconsultant represents and warrants to Symbiont that such design services shall be performed by and/or under the direction of an appropriately registered professional engineer or architect licensed to practice in the state of the subject project.  The registered professional shall, upon completion of the design, stamp and certify all plans, specifications, calculations, etc. to certify his or her professional role in the project.

**Article 6.  Timeliness of Performance**

The Subconsultant acknowledges that time is of the essence in completing its services under this Agreement.

**Article 7.  Force Majeure**

Neither party to this Agreement will be liable to the other party for delays in performing the Scope of Work, or for the direct or indirect cost resulting from such delays, that may result from labor strikes, riots, war, acts of governmental authorities, extraordinary weather conditions or other natural catastrophe, or any other cause beyond the reasonable control or contemplation of either party.

In the event either party to the Agreement has knowledge of any actual or potential delay, that party shall notify the other party in writing of such cases in delay and its probable extent.

**Article 8.  Suspension**

The Subconsultant will, upon ten (10) days written notice from Symbiont suspend, delay or interrupt all or a part of the Scope of Work.  In such event, the Subconsultant will resume the Scope of Work upon written notice from Symbiont and an appropriate extension of time shall be mutually agreed upon and added to the Subconsultant's time of performance.



FORM SDB-3 02-2016

**Article 9.  Termination**

Symbiont will have the right to immediately terminate this Subconsultant Agreement at its discretion upon written notice.

This Agreement may be immediately terminated by either party upon written notice in the event of substantial failure by the other party to perform in accordance with the terms hereof.   After termination, Subconsultant will be ~~paid~~reimbursed for services rendered and reimbursed for all necessary expenses incurred to the termination date upon submission to Symbiont of detailed supporting invoices.   Subconsultant will not be entitled to profit or other compensation on services not performed.

Either party may terminate this Agreement immediately upon written notice to the other party in the event that the other party becomes insolvent, files a petition in bankruptcy, is adjudicated bankrupt, has an assignee, referee, receiver or trustee appointed in any creditor action, has a petition in bankruptcy filed against it which is not vacated within thirty (30) days or suffers any analogous action.

**Article 10.  Notice to Parties**

All notices required or permitted under this Agreement shall be in writing and shall be made to the parties' usual place of business.

**Article 11.  Dispute Resolution**

Symbiont and Subconsultant shall provide written notice of a dispute within a reasonable time after the event giving rise to the dispute.  Symbiont and Subconsultant agree to negotiate any dispute between them in good faith for a period of 30 days following such notice.  Symbiont and Subconsultant may agree to submit any dispute to mediation, but such mediation shall not be required as a prerequisite to initiating a lawsuit to enforce this Agreement.  Either party shall have the right to litigate the claim, dispute or other matter in question in any state or federal court located in New Jersey~~Milwaukee County, Wisconsin~~.  In connection therewith, each party agrees to submit to the jurisdiction of such court.

In the event that legal action is brought by either party against the other in the Courts (including action to enforce or interpret any aspect of this agreement), the prevailing party shall be reimbursed by the other for the prevailing party's legal costs, in addition to whatever other judgments or settlement sums, if any, may be due.  Such legal costs shall include, but not be limited to, reasonable attorney's fees, court costs, expert witness fees, and other documents expenses, in addition to any other relief to which it may be entitled.

<mark>Neither party will be responsible to the other for special or consequential damages including but not limited to, loss of profits, loss of investment or business interruption.</mark>  The Subconsultant also agrees to seek recourse only against Symbiont and not its officers, employees, directors, or shareholders.

**Article 12.  Choice of Law**

This Agreement shall be governed and construed in accordance with the laws of the State of New Jersey ~~Wisconsin~~, without reference to conflicts of law principles. ~~Each party hereto consents to the exclusive jurisdiction of the state and federal courts located in Milwaukee County, Wisconsin for any actions, suits or proceedings arising out of or relating to this Agreement.~~

**Article 13.  Insurance**

The Subconsultant declares and shall submit an insurance certificate that it maintains the following insurance coverage:

    A.  Workers' Compensation:
        of a form and in an amount as required by state law

    B.  Employer's Liability:
        $1,000,000 per accident
        $1,000,000 disease, policy limit
        $1,000,000 disease, each employee

P:\Treton Biogas LLC\DB180999 Digester Design & Permitting\A3-O2-DB180999-229-GIS.docx
Q:\Contract Administration\Symbiont DB Subconsultant 02-2016

Page **3** of 9



    C.  Commercial General Liability (bodily injury and property damage – combined single limit):
        $1,000,000 per occurrence
        $2,000,000 aggregate

    D.  Contractor's Pollution Liability:
        $1,000,000 per occurrence

    E.  Automobile Liability (owned, non-owned and hired vehicles):
        $1,000,000 combined single limit

    F.  Professional Liability:
        $1,000,000 per occurrence

    G.  Excess/Umbrella Liability:
        $2,000,000 per occurrence
        $2,000,000 aggregate

Symbiont and Owner shall be named as an additional insured with respect to Subconsultant's insurance policies described in lines C, D, E, and G above and Subconsultant waives subrogation against Owner and Symbiont as to all policies above and the Subconsultant shall furnish Symbiont with a Certificate evidencing the same.

All insurance certificates shall state that the insurance carrier will give Symbiont thirty (30) days notice of any cancellation or material change of the policies.

Any deductibles or self-insured retentions must be declared to and approved by Symbiont. At the option of Symbiont, either: the insurer shall reduce to a maximum of $50,000 or eliminate such deductibles or self-insured retentions as respects Symbiont, its officials and employees or provide satisfactory financial evidence to Symbiont of the Subconsultant's ability to fund the deductible amount if necessary. Any self-insured retention or deductible amount on the policy shall not reduce the amount of collectible limits of liability.

If any of the aforementioned insurance policies are written on a claims-made basis, the Subconsultant warrants that continuous coverage will be maintained or an extended discovery period will be exercised for a period of one year ~~five years~~ beginning from the time the work under this contract is completed.

The insurance companies providing the coverage shall maintain a minimum A.M. Best financial rating of at least A —.

Subconsultant agrees to indemnify and save Symbiont harmless from and against all liability, loss or expense (including costs and attorneys' fees) arising out of or in consequence of Subconsultant's failure to obtain the required coverages or to meet the other insurance requirements of this Agreement.

Neither Symbiont's failure to require or to insist upon certificates or other evidence of insurance, nor Symbiont's acceptance of a certificate or other evidence of insurance showing a variance from the specified coverage, changes or waives Subconsultant's obligation to comply with the insurance specifications of this Agreement.

Symbiont may, at its sole discretion, withhold payment to Subconsultant for failure of to provide a Certificate of Insurance. Symbiont's payment to Subconsultant shall not change or waive Subconsultant's obligation to comply with the insurance specifications of this Agreement.

**Article 14. Indemnification**

Symbiont and the Subconsultant mutually agree, to the fullest extent permitted by law, to indemnify and hold each other harmless from any and all damage, liability or cost (including reasonable attorneys' fees and costs of defense) arising from their own negligent acts, errors or omissions in the performance of their services/work under this Agreement, to the extent that each party is responsible for such damages and losses on a comparative basis of fault.

Subconsultant agrees, to the fullest extent permitted by law, to indemnify and hold Symbiont harmless from any and all damage, liability or cost (including reasonable attorneys' fees and costs of defense) arising from any lower-tier subconsultant's or subcontractor's negligent acts, errors or omissions in the performance of their services/work under this Agreement, to the extent that such lower-tier subconsultant or subcontractor is responsible for such damages and losses.



**FORM SDB-3 02-2016**

**Article 15.  Safety**

Subconsultant shall take reasonable precautions to perform the Scope of Work in a safe manner and is responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the Subconsultant's work. Subconsultant will be solely responsible for working conditions on those portions of the Project job site reasonably within Subconsultant's work area, including the safety of all persons and property during performance of the Scope of Work, in addition to providing any and all safety equipment or articles necessary to protect its employees and agents and to comply with applicable OSHA regulations and requirements of the Owner of the Project job site.  Any monitoring of Subconsultant's procedures conducted by Symbiont will not include a review of the adequacy of Subconsultant's safety measures in, on, adjacent to, or near any Project job site.  Symbiont's responsibility for Project job site safety is limited solely to its own employees and the provision of appropriate training, supervision and personal protective equipment for those employees.

An expression of concern by Symbiont regarding the Subconsultant's safety practices shall not be construed as usurping the responsibility of the Subconsultant for the safety of the Subconsultant's work.

**Article 16.  Assignment/Lower-Tier Subconsultants**

This Agreement and the rights and duties hereunder shall not be assigned, subcontracted, or transferred by Subconsultant, in whole or in part, without Symbiont's prior written approval.  Subconsultant shall inform Symbiont in writing of the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for any portion of the work subject to this Agreement.  If Symbiont objects to any lower-tier subconsultant or supplier, such objection will be given in writing to Subconsultant within a reasonable period of time, specifying the basis for the objection.  Subconsultant shall not contract with a lower-tier subconsultant or supplier reasonably objected to by Symbiont.

Prior to Symbiont's payment of progress payments and/or the final payment to Subconsultant, Subconsultant shall deliver proof satisfactory to Symbiont of full payment to all lower-tier subconsultants, suppliers, and for all labor, materials, supplies, machinery and equipment furnished for or used in performance of the Scope of Work identified in this Agreement.  Such proof will include all necessary releases or waivers of liens supported by affidavits, all satisfactory to Symbiont, establishing that all liens and rights to claim liens which could arise out of performance of this Agreement, have been waived.

So long as Subcontractor has been paid on a timely basis for un-contested completed work.  Subconsultant shall take all actions within its control (including the execution, acknowledgement, delivery and filing of such waivers, releases and other documents) to prevent any mechanics' or materialmen's liens or any other liens or encumbrances from being filed in respect of or placed upon any real property or improvements owned or leased by Symbiont or Owner as a result of or in connection with any work performed by or any other action or omission on the part of Subconsultant or any lower-tier subconsultants or suppliers or other person claiming by, through or under Subconsultant including, but not limited to, any liens or encumbrances arising by reason of the construction, use, occupancy, maintenance, repair or rebuilding of any such property or improvements or the furnishing of any labor, materials or supplies. If, notwithstanding the immediately preceding sentence, any mechanics' or materialmen's lien or other lien or encumbrance is filed in respect of or placed upon such property or improvements and if Subconsultant does not cause such lien or encumbrance to be fully and effectively released and discharged, or does not cause such lien or encumbrance to be bonded over in a manner acceptable to Symbiont and Owner, Symbiont shall be entitled, without prejudice to any other rights or remedies available to it, to pay directly to the holder of such lien or encumbrance all sums necessary to obtain its immediate release and discharge and to credit all sums so paid against any amount due or to become due to Subconsultant under or in connection with this Agreement or any other agreement with Subconsultant.

**Article 17.  Communication with Owner**

All of the Subconsultant's written or verbal communication with or to the Owner, or with federal, state, or local agencies, relative to work under this Agreement must be through or with knowledge of Symbiont.

**Article 18.  Copies of Data**

Unless otherwise called for in the Scope of Work, one legible copy each of all notes, field notes, drawings, prints, and plans prepared under the terms of the Subconsulting Agreement shall be delivered by the Subconsultant to Symbiont upon completion of the Scope of Work or termination of the Agreement.



**FORM SDB-3 02-2016**

**Article 19.  Soliciting Employment**

Neither party to this Subconsultant Agreement shall solicit an employee of the other party, nor hire or make an offer of employment to an employee of the other party, without prior written consent of the other party, during the time this Subconsultant Agreement is in effect.

**Article 20.  Waiver**

No waiver by Symbiont of any term or condition set forth herein, whether by conduct or otherwise, in any one or more instances, shall be deemed or construed as a further or continuing waiver of any such term, condition or breach or a waiver of any other term, condition or breach.

**Article 21.  Headings**

The subject headings in this Agreement are for convenience only and are not determinative of the substance of the subject clause.

**Article 22.  Entire Agreement**

The parties agree that this Agreement, together with Attachment 1, represents the sole and entire integrated Agreement of the parties with respect to the project and supersedes all prior communications, negotiations, representations, quotations, offers or agreements, either written or oral between the parties hereto, with respect to the subject matter hereof, and no agreement or understanding varying or extending this Agreement shall be binding upon either Party, other than by a written agreement signed by both Subconsultant and Symbiont.  If additional documents represent the agreement of the parties, such documents must be itemized, referencing this Article 22, in Attachment 1.

**Article 23.  Severability**

If any provision or part of a provision of this Agreement is declared to be invalid by any tribunal of competent jurisdiction, such part shall be deemed automatically adjusted, if possible, to conform to the requirements for validity, but if such adjustment is not possible, it shall be deemed deleted from this Agreement as though it had never been included herein. In either case, the balance of any such provision and of this Agreement shall remain in full force and effect.

**Article 24.  Change Orders**

Any amendments to this Agreement shall be executed by means of a written change order, signed by the Subconsultant and Symbiont.  Changes to the Agreement will not become effective until the change order has been signed by both parties.  The change order will document the specific changes to the Agreement along with any resulting adjustment in cost and/or schedule.

IN WITNESS WHEREOF, the parties have executed this Agreement including Attachment 1, which includes a description of the scope of work, schedule, method of compensation, and Supplemental Terms and Conditions of Agreement (if any), and is incorporated by reference into these Terms and Conditions of Agreement.  This Agreement may be executed in counterparts, each of which shall constitute an original, but both of which when taken together shall constitute one and the same agreement.  The parties agree that a counterpart of this Agreement may be executed by a party and then delivered to the other party by facsimile or other electronic means, and such facsimile or other electronic copy will constitute an original counterpart.  The signatories below represent that they are duly authorized by the business entities they represent to sign this Agreement.  The effective date of this Agreement is the later of the signature dates below.

P:\Treton Biogas LLC\DB180999 Digester Design & Permitting\A3-O2-DB180999-229-GIS.docx
Q:\Contract Administration\Symbiont DB Subconsultant 02-2016

Page **6** of **9**



**FORM SDB-3 02-2016**

Subconsultant: Ground Improvement Services, Inc.

Name: Kenneth J. Leahy

Chief Operating Officer
Title

2/8/18
Date

Symbiont Design-Build, LLC:

Name:

Vice President
Title

02/08/18
Date

P:\Treton Biogas LLC\DB180999 Digester Design & Permitting\A3-O2-DB180999-229-GIS.docx
Q:\Contract Administration\Symbiont DB Subconsultant 02-2016

Page 7 of 9



**ATTACHMENT 1**
**TO SYMBIONT® DESIGN-BUILD, LLC**
**SUBCONSULTANT**
**PROFESSIONAL SERVICES AGREEMENT**

| | |
|---|---|
| Project Name | Trenton Biogas<br>Digester Foundation Design and Permitting Assistance |
| Project No. | DB180999 |
| Subcontractor | Ground Improvement Services, Inc.<br>PO Box 918<br>Purcellville, VA 20134<br>Steward Station, PM<br>703-869-7495<br>Attn: Kurt Levins, P.E.<br>862-763-0468 |
| Owner | Trenton Biogas, LLC |
| Site Location | Trenton Biogas<br>1600 Lamberton Road<br>Trenton, NJ 08611 |
| Scope of Work | Scope of work shall consist of soil improvement system design services as summarized in Ground Improvement Services, Inc. quote dated 01/30/18 for three (3) digester tanks and one buffer tank for the proposed Trenton Biogas Facility in Trenton, NJ.  All design documents shall be stamped by a registered professional engineer licensed in the state of New Jersey.  The deliverable for this project shall be stamped design drawings and calculations for use by the Owner to obtain a construction permit from the local permitting authority. |
| Compensation | Lump sum fee of $47,800<br><br>Provide invoices to the attention of Brian Till that identify the Symbiont project number DB180999 and delineates the scope of work provided. |
| Schedule | Time is of the essence.  All design work must be completed within two weeks of receipt of final design loads. |
| Supplemental Conditions | 1. The Owner is an intended third-party beneficiary to this Agreement.  This Agreement is assignable to Owner, without further consent or approval by Subconsultant, upon Symbiont's written request following default by Symbiont or termination or expiration of the Contract between Owner and Symbiont.<br>2. Subconsultant shall enter into a new contract directly with the Owner on the same terms and conditions as this Agreement in the event that any trustee in bankruptcy for Symbiont rejects this Agreement, or the Subconsultant terminates this Agreement as a result of the bankruptcy of Symbiont. |



*FORM SDB-3 02-2016*

3. Subconsultant shall provide reasonable cooperation and further assurances in connection with Owner's efforts to obtain debt and/or equity financing for the Project facility as Owner shall reasonably request and shall use commercially reasonable efforts to cause its lower-tier subcontractors to do the same. Without limiting the foregoing, within twenty (20) business days after Owner's written request, Subconsultant shall execute and deliver to Owner a written consent in a form satisfactory to Owner, and such consents to assignment and related agreements as shall be typical in project finance transactions on the form customarily used by such financing parties, for the benefit of Owner's financing parties, in either case together with such changes as the financing parties shall reasonably request. Any costs (including reasonable attorney's fees) incurred by Subconsultant in connection with complying with the terms of this provision, including any legal opinions required to support any such financing party consents, shall be at Owner's costs and shall be in addition to the Compensation in Attachment 1 of this Agreement.

4. Article 16 – Insurance. Item F, Professional Liability. Subconsultant shall provide an insurance certificate with $5,000,000 per occurrence of Professional Liability Insurance.

P:\Treton Biogas LLC\DB180999 Digester Design & Permitting\A3-O2-DB180999-229-GIS.docx
Q:\Contract Administration\Symbiont DB Subconsultant 02-2016

Page 9 of 9

# EXHIBIT D

# SYMBIONT/SUBCONTRACTOR
# CHANGE ORDER



DISTRIBUTION TO:

Symbiont PM _____

Contractor _____

Central File _____

| | | |
|---|---|---|
| **PROJECT:** (Name & Address) | Trenton Biogas | **CHANGE ORDER NUMBER:** 1 |
| | 1600 Lamberton Road | **INITIATION DATE:** 5/30/2018 |
| | Trenton, NJ 08611 | **PROJECT MANAGER:** Brian Till |
| **TO CONTRACTOR:** (Name & Address) | Ground Improvement Services | **CONTRACT SERVICES:** Soil Improvement |
| | PO Box 918 | **CONTRACT DATE:** 2/8/2015 |
| | Purcellville, VA 20134 | |

You are directed to make the following changes in this Contract:

Grouted impact pier foundation system construction per Ground Improvement Services design documents dated 4/4/18 and Ground Improvement Services proposal No. 7820 RI dated 1/20/18.  Scope of work includes mobilization, modulus test, three (3) digester RI elements, and one (1) buffer tank RI elements.   1/30/18

Not valid until signed by the Symbiont Representative and CONTRACTOR.

CONTRACTOR agrees that this Change Order includes any and all costs associated with or resulting from the change ordered herein, including all impacts, delays, and accelerated costs.  Other than the dollar amount and time allowance listed above, there shall be no other dollar or time compensation as a result of this Change Order.

| | | |
|---|---|---|
| The original Contract Price………………………………………………………………… | $ | 47,800.00 |
| Net change by previously authorized Change Orders……………………………………… | $ | - |
| Net increase / (decrease) of this Change Order………………………………………… | $ | 551,110.00 |
| Revised Contract Price including this Change Order……………………………………… | $ | 598,910.00 |
| The Contract Time will be (increased)/(decreased) by…………………………………… | N/A | Days |
| The revised Date of Substantial Completion is………………………………...………… | N/A | |

**Ground Improvement Services**

CONTRACTOR (Company Name)

PO Box 918
Purcellville, VA 20134
ADDRESS

By (Signature)    6/6/18    DATE

Pete Sacripanti, CFO

**SYMBIONT**

6737 West Washington Street, Suite 3440
West Allis, Wisconsin 53214
414-291-8840
Fax:  414-291-8841
ADDRESS

By (Signature)    05/30/18    DATE

TRUSTED FOR GOOD REASON.

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SYMBIONT SCIENCE, ENGINEERING AND CONSTRUCTION, INC.; ZURICH AMERICAN INSURANCE COMPANY a/s/o Symbiont Science, Engineering and Construction, Inc.; AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, a/s/o Symbiont Science, Engineering and Construction, Inc. and STEADFAST INSURANCE COMPANY a/s/o Symbiont Science, Engineering and Construction, Inc., <br><br> Plaintiffs <br><br> vs. <br><br> GROUND IMPROVEMENT SERVICES, INC.; JOHN DOES 1-10, (fictitious parties) and ABC COMPANIES 1-10 (fictitious parties); GEOSTRUCTURES OF VIRGINIA, INC. <br><br> Defendants. | CIVIL ACTION NO. 3:22-04905 <br><br> **SECOND AMENDED COMPLAINT WITH JURY DEMAND FILED WITH CONSENT OF OPPOSING COUNSEL PURSUANT TO FRCP 15(a)(2)** |

Plaintiffs, Symbiont Science, Engineering and Construction, Inc.; Steadfast Insurance Company, as subrogee of Symbiont Science, Engineering and Construction, Inc.; American Guarantee and Liability Insurance Company, as subrogee of Symbiont Science, Engineering and Construction, Inc. and Zurich American Insurance Company, as subrogee of Symbiont Science, Engineering and Construction, Inc., by and through their counsel, and by way of Complaint, state as follows:

## PARTIES

1.      Plaintiff, Symbiont Science, Engineering and Construction, Inc. ("Symbiont") is a corporation organized and existing under the laws of the State of Wisconsin with its principal place of business at 6737 W. Washington Street, Suite 3500, West Allis, Wisconsin 53214.

2.      Plaintiff, Steadfast Insurance Company ("Steadfast") is an Illinois corporation engaged in the insurance business with a statutory home office located at 1299 Zurich Way, Schaumburg, Illinois 60196, and its principal place of business located at 1299 Zurich Way, Schaumburg, Illinois 60196. Steadfast operates as a non-admitted surplus lines insurer in New Jersey and is authorized to do business in New Jersey.

3.      American Guarantee and Liability Insurance Company ("AGLIC") is a New York corporation engaged in the insurance business with a statutory home office located at 4 World Trade Center, 150 Greenwich Street, New York, NY 10007, and its principal place of business located at 1299 Zurich Way, Schaumburg, Illinois 60196. AGLIC is authorized to transact business and has transacted business in New Jersey.

4.      Plaintiff, Zurich American Insurance Company (hereinafter "Zurich") is a New York corporation company engaged in the insurance business with a statutory home office and principal place of business located at 1299 Zurich Way, Schaumburg, IL 60196.   Zurich is authorized to transact business and has transacted business in New Jersey.

5.      Steadfast, AGLIC and Zurich are hereinafter collectively referred to as Zurich.

6.      Defendant, Ground Improvement Services, Inc. ("GIS"), is corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 413 Browning Court, Purcellville, Virginia.

7.      GIS is a consultant that provides, among other things, soil improvement design and construction services.

8.      Defendant, GeoStructures, Inc. of Virginia, Inc. ("GeoStructures") is a corporation organized under the laws of the Commonwealth of Virginia with its principal place of business located at 413 Browning Court, Purcellville, Virginia.

9.      GeoStructures is a consultant that provides professional services in the geotechnical engineering and construction monitoring field including soil and site inspection and assessment of soil conditions.

10.     John Does 1 – 10 and ABC Companies 1 – 10 are fictitious parties and Defendants who are entities and/or individuals who have yet to be identified by Plaintiffs as Defendants but whose identity as Defendants may be revealed during the period of discovery that will occur relative to this action and who may be liable for Plaintiffs' damages as referenced herein. Such individuals/entities may include but are not necessarily limited to manufacturers, brokers, salespeople, agents, managers, owners, technicians, shareholders, members, independent contractors, customer service representatives, inspectors, engineers, designers, architects and the like.

## VENUE

11.     Jurisdiction of this Court arises under 28 U.S.C. §1332 as the matter at issue involves claims between citizens of different States, and there is complete diversity and the amount in controversy exceeds $75,000.00.

12.     Venue lies properly in this District pursuant to 28 U.S.C. §1391(b) in that the events giving rise to the claims occurred in Mercer County, New Jersey and the within action is properly brought in the United States District Court for the District of New Jersey.

## FACTS

13.     Trenton Biogas, LLC is the owner of a Biogas Production Facility (the "Facility") located in Trenton, New Jersey.

14.     Symbiont is an engineering, consulting, and design-build firm focused on environmental and process projects.

15.     On December 19, 2018, Symbiont entered into an Engineering, Procurement and Construction Contract ("EPC Contract") with Trenton Biogas pursuant to which Symbiont provided to Trenton certain engineering, procurement, and construction management services in connection with the construction of an anaerobic digestion and biogas production facility in Trenton, New Jersey ("the Facility").

16.     The Facility was designed to process food products, pharmaceutical grade alcohols, and glycerin to produce methane, compost and fertilizer.

17.     Symbiont, as a full-service engineering and construction services contractor, had the technical capabilities to provide services to Trenton, including engineering, procurement, and construction management services at the Facility and start-up assistance with respect to operation of the Facility.

18.     The Facility construction included the construction of four (4) tanks, i.e., three (3) digester tanks and one (1) buffer tank.

19.     The three (3) digester tanks are 1.3 million gallon above ground storage tanks with a diameter of 56 feet each and the buffer tank is a 467,000 gallon above ground storage tank with a diameter of 36.42 feet.

20.     On January 5, 2018, GZA GeoEnvironmental, Inc. ("GZA") issued a Geotechnical Engineering Evaluation Report with regard to the Facility property.

21.     The GZA report indicated that in order to construct the facility the ground would need to be stabilized and reinforced due to the existing near surface fill layer being generally unsuitable for support of foundations.

22.     On February 8, 2018, GIS entered into a contract with Symbiont to provide soil improvement design services. See Exhibit A, Symbiont/GIS Contract.

4

23.     Pursuant to the Symbiont/GIS Contract, GIS was to design the soil improvement system with a maximum Long Term Settlement under the digester and buffer tanks of up to 2 inches. See Exhibit B, Scope of Work, 2.1.4.3.

24.     Pursuant to the Symbiont/GIS Contract, GIS was to design the soil improvement system with a maximum differential settlement of $^1/_2$ inch. See Exhibit B, Scope of Work, 2.1.4.4.

25.     GIS engaged the services of GeoStructures to effectuate the necessary design of the soil improvement system.

26.     The Symbiont/GIS Contract provides that GIS was to obtain insurance naming both Symbiont and the Owner, Trenton Biogas, as additional insureds on its Commercial General Liability Policy(ies), Contractor's Pollution Policy(ies), Automobile Liability Policy(ies) and Excess/Umbrella Liability Policy(ies). See Exhibit A, Article 13. Insurance.

27.     The Symbiont/GIS Contract provides that GIS "agrees to indemnify and save Symbiont harmless from and against all liability, loss or expense, including costs and attorney's fees, arising out of or in consequence of [GIS's] failure to obtain the required coverages or to meet the other insurance requirements of this Agreement. Id.

28.     The Symbiont/GIS Contract contains the following Indemnification clause:

> Subconsultant [GIS] agrees, to the fullest extent permitted by law to indemnify and hold Symbiont harmless from any and all damage, liability or cost (including reasonable attorneys' fees and costs of defense) arising from any lower tier subconsultant's or subcontractor's negligent acts, errors or omissions in the performance of their services/work under this Agreement, to the extent that such lower-tier subconsultant or subcontractor is responsible for such damages and losses.

Exhibit A, Article 14. Indemnification.

29.     Pursuant to the Symbiont/GIS Contract, all disputes thereunder are to be brought in any state or federal court located in New Jersey. See Exhibit A, Article 11. Dispute Resolution.

30.     Further, the Symbiont/GIS Contract is governed and construed in accordance with the laws of the State of New Jersey, without reference to conflicts of law principals. See Exhibit A, Article 12, Choice of Law.

31.     On May 30, 2018, Symbiont and GIS entered into a change order for the "Grouted impact pier foundation system construction per Ground Improvement Services design documents dated 4/4/18 and Ground Improvement Services proposal No. 7820 RI dated 1/30/18. The scope of Work includes mobilization, modulus testing, three (3) digester RI elements and one (1) buffer tank RI elements. See Exhibit C, Symbiont/Subcontractor Change Order.

32.     GIS performed the implementation of the soil improvements at the property.

33.     The ground improvement pier construction occurred through July 2018 and was completed in mid-August 2018. As part of the construction scope of work, GIS completed a load test on an installed test pier.

34.     On September 5, 2018, Symbiont received correspondence from GIS that indicated that the load test showed compliance with the settlement performance requirements.

35.     Immediately following the installation of the ground improvement pier system, another subcontractor constructed the four tank concrete floor slabs, under a direct contract with Symbiont, followed by the erection of bolted steel-based tanks supplied by Schumann Tanks under a direct contract with Trenton Biogas.

36.     From March 2019 through May 2019 the tanks were subject to a water test, i.e., each tank was filled with water to its operating capacity.

37.     Upon the initial filling of the tanks, indications of foundation settlement were observed through buckling of the elevated steel walkways spanning between the tanks.

38.     On May 2, 2019, Symbiont notified GIS of the settlement of the tanks and the observed damages.

39.     In June 2019, during several conversations between Symbiont and GIS, GIS maintained that following the initial tank filling and loading, settlement should cease.

40.     After the water test, the tanks were drained, removing the load on the foundation system.

41.     Through the winter of 2019-2020, Trenton Biogas initiated operations slowly bringing the tanks into service.

42.     When the tanks reached full operating capacity in April, 2020 the settlement resumed.

43.     In May 2020, further discussions between Symbiont and GIS commenced.

44.     At that time, based on the recommendation of the tank supplier, Digesters 1 and 2 were required to operate at 70% tank level to prevent a catastrophic tank rupture due to the excessive differential settlement, and the tank and mixer suppliers recommended operating the mixers in Digesters 1 and 2 at 30% of normal operating speed to prevent mixer failure.

45.     As settlement continued, stress was observed on the ladder and intermediate platform structures between Digesters 1 and 2 which provided access and egress to/from the roof mounted walkways.

46.     In July 2020 the ladder and intermediate platform structures were removed and replaced with temporary scaffolding and ladders to prevent damage to the structure while

maintaining the required operational access. Installation of the temporary scaffolding and ladder system was a necessary life safety measure.

47.     From approximately June 2020 through November 2021, Symbiont was providing GIS with survey data collected approximately every two (2) weeks documenting the continued settlement.

48.     As of June 2020, Digesters 1 and 2 had each settled five and a half (5 $^1\!/_2$) inches, exceeding the ultimate allowable settlement by almost 200 percent.

49.     GIS returned to the site in July 2020 and performed additional soil borings. In a letter dated September 21, 2020, GeoStructures, GIS's subsidiary, stated that data from the additional borings indicated that Digesters 1 and 2 should be expected to settle more than the two (2) inches allowed by GIS contract with Symbiont.

50.     On November 10, 2020, Trenton Biogas informed Symbiont that due to continued tank settlement, the mixer in Digester 1 was out of level tolerance and required re-leveling to prevent further damage. Symbiont contacted Schumann, who furnished and installed the mixer, to obtain the recommended procedure for re-leveling the mixer.

51.     Due to GIS' failure to take responsibility for their contractual obligations, the mixer levelling has not yet occurred.

52.     The differential settlement to date is in the range of six (6) to seven (7) inches.

53.     Further differential settlement in Digesters 1 and 2 subsided as a result of reducing tank levels to 70% but likely still continues.

54.     Trenton Biogas placed Symbiont on notice of a dispute, as defined in the EPC Contract, relating to the settlement of the digester tanks and buffer tank.

55.     Pursuant to the Article 20 of the EPC Contract, Trenton Biogas and Symbiont engaged in mediation to resolve Trenton Biogas' claims asserted against Symbiont in regard to the settlement of the digester tanks and buffer tank.

56.     A settlement was reached between Trenton Biogas and Symbiont on February 23, 2022 whereby Symbiont agreed to pay to Trenton Biogas the total sum of $11,715,000.00 in exchange for a full release of all of Trenton Biogas' claims relating to the settlement of the digester tanks and buffer tank.

57.     Zurich undertook financial responsibility for the loss and claims against Symbiont pursuant to its policies of insurance with Symbiont.

58.     Zurich has expended over $11,715, 000.00 in connection with the claims relating to the settlement of the digester tanks and buffer tank.

59.     Zurich is subrogated to all the rights and remedies that Symbiont has against GIS to the extent of the payments made by Zurich to or on behalf of Symbiont in settlement of the claims relating to the settlement of the digester tanks and buffer tank as a result of the actions, inactions, omissions and failures of GIS and the other defendants.

60.     Symbiont sustained and incurred additional losses, costs and expenses beyond what were paid by Zurich, in excess of $3,285,000.00, and Symbiont faces additional claims by Trenton Biogas, totaling in excess of $4,000,000.00 for alleged damages that were also caused by the actions, inactions and failure of GIS and the other defendants.

61.     The additional losses, costs and expenses sustained and incurred by Symbiont were a direct and proximate result of the foregoing acts and omissions of GIS and the other defendants.

## FIRST COUNT
## Plaintiffs v. GIS
## (Negligence/Professional Malpractice)

62.     Paragraphs 1 through 61 are repeated as though fully set forth at length herein.

63.      GIS provided design, planning, engineering, supervisory, and other services with regard to the development and construction of a soil improvement system at the Facility, and owed the Plaintiffs a duty to exercise that degree of reasonable care, technical skill, ability, and diligence ordinarily exercised by engineers and engineering firms in similar circumstances and in the planning, designing, supervising, reviewing, inspecting, monitoring, managing, and in otherwise providing architectural and engineering services in the development and construction of the soil improvement system at the Facility.

64.     Upon information and belief, John Does 1 – 10 and ABC Companies 1 – 10 provided general contracting, supervisory, site management, construction, installation, oversight, and related services and/or materials with regard to the development and construction of the Facility, and owed Plaintiffs a duty to exercise that degree of reasonable care that ordinarily would be exercised by ordinary, prudent persons in similar circumstances while providing such services relating to the development and construction of the Facility.

65.     There existed numerous defects and deficiencies in the design and construction of the Facility.

66.     GIS breached the duties of care that it each owed to Plaintiffs and were negligent in that it failed to properly design, plan, supervise, manage, install, construct, and/or supply adequate services and/or materials for and otherwise breached its duties with respect to the design, development and construction of the soil improvement system at the Facility and is responsible for the numerous defects and deficiencies.

67.     As a direct, proximate and foreseeable result of the negligence of GIS, the Plaintiffs have been injured in that portions of the Facility and/or its subcomponents that incurred and sustained damages including, but not limited to, the substantial expenses and costs incurred to repair and/or replace the defects and deficiencies.

WHEREFORE, Plaintiffs demand judgment against GIS, jointly, severally and in the alternative for compensatory and consequential damages, attorneys' fees, costs, interest, and such other relief as the Court deems just and equitable.

## SECOND COUNT
### Plaintiffs v. GIS
### (Breach of Contract, Contractual Indemnification)

68.     Paragraphs 1 through 67 are repeated as though fully set forth at length herein.

69.     Pursuant to the express terms of the contracts between GIS and Symbiont, GIS expressly agreed to indemnify Symbiont and hold it, its agents and employees harmless from and against any and all claims arising from any of GIS's lower tier subconsultant's or subcontractor's negligent acts, errors or omissions in the performance of their services/work under this GIS/Symbiont Agreement, to the extent that it or such lower-tier subconsultant or subcontractor is responsible for such damages and losses.

70.     Symbiont and Zurich as subrogee of Symbiont, are entitled to contractual indemnification from GIS in an amount in excess of $15,000,000.00 as well as attorney fees and costs incurred in defending the claims by Trenton Biogas and in bringing this action.

WHEREFORE, Plaintiffs demand judgment against GIS for compensatory and consequential damages, attorneys' fees, costs, interest, and such other relief as the Court deems just and equitable.

## THIRD COUNT
### Plaintiffs v. GIS
### (Breach of Express Warranty)

71.     Paragraphs 1 through 70 are repeated as though fully set forth at length herein.

72.     GIS expressly warranted to Symbiont that all materials and equipment furnished by GIS in connection with the construction of the soil improvements, and all work performed by GIS, would be of good quality, free of faults and defects, and in conformance with the contract documents.

73.     GIS also expressly warranted that that the tanks would not settle more than 2 inches or have differential settlement of more than ½ inch.

74.     GIS has breached their express warranties with regard to their work and materials.

75.     Symbiont and Zurich as subrogee of Symbiont, have been damaged by such breaches in that it was exposed to significant liability and incurred substantial costs and counsel fees.

WHEREFORE, Plaintiffs demand judgment against GIS for compensatory and consequential damages, attorneys' fees, costs, interest, and such other relief as the Court deems just and equitable.

## FOURTH COUNT
### Plaintiffs v. GIS
### (Breach of Implied Warranty)

76.     Paragraphs 1 through 75 are repeated as though fully set forth at length herein.

77.     GIS impliedly warranted to Symbiont that it possessed the skill, experience, training and expertise to perform the work in accordance with the care and skill customary in the construction industry, and that, if selected by Symbiont, it would, in fact, use such care and skill in performing their work at the Facility.

78.     GIS also impliedly warranted to Symbiont that its work would be of good quality, free of defects, in conformity with contract documents, safe, and fit for the intended purposes of at the Facility.

79.     GIS has breached their implied warranties.

80.     Symbiont and Zurich as subrogee of Symbiont, have been damaged by such breaches in that it was been exposed to significant liability in an amount in excess of $15,000,000.00 and have incurred substantial costs and counsel fees.

WHEREFORE, Plaintiffs demands judgment against GIS for compensatory and consequential damages, attorneys' fees, costs, interest, and such other relief as the Court deems just and equitable.

**FIFTH COUNT**
**Plaintiffs v. GIS**
**(Breach of Contract, Procurement of Insurance)**

81.     Paragraphs 1 through 80 are repeated as though fully set forth at length herein.

82.     Pursuant to the express terms of the contracts between GIS and Symbiont, GIS expressly agreed to procure insurance naming Symbiont as an additional insured.

83.     GIS failed to do so.

84.     Symbiont and Zurich as subrogee of Symbiont, are entitled to damages from GIS in an amount in excess of $15,000,000.00 that is as a result of GIS's breach of its express contractual insurance provision obligation.

WHEREFORE, Plaintiffs demand judgment against Symbiont for compensatory and consequential damages, attorneys' fees, costs, interest, and such other relief as the Court deems just and equitable.

13

## SIXTH COUNT
### Plaintiffs v. GIS
### (Common Law Indemnification)

85.     Paragraphs 1 through 84 are repeated as though fully set forth at length herein.

86.     Plaintiffs assert the damages sustained by the Plaintiff were the proximate result of the negligence, wrongdoing, and/or defective workmanship and products and materials provided by GIS, which negligence, wrongdoing, and/or defective work and material were the primary and active cause of the Plaintiffs' alleged damages.

87.     Plaintiffs are entitled to common law indemnification from GIS in an amount in excess of $15,000,000.00 plus attorney's fees and costs as a result of its wrongdoing.

WHEREFORE, Plaintiffs demands judgment against GIS for compensatory and consequential damages, attorneys' fees, costs, interest, and such other relief as the Court deems just and equitable.

## SEVENTH COUNT
### Plaintiffs v. GeoStructures
### (Negligence/Professional Malpractice)

88.     Paragraphs 1 through 87 are repeated as though fully set forth at length herein.

89.     GeoStructures provided engineering, surveying, assessment, testing and related services with regard to the necessary implementation of the soil improvements at the facility for purposes of construction and installation of the three digester tanks and one buffer tank, and owed the Plaintiffs a duty to exercise that degree of reasonable care, technical skill, ability, and diligence ordinarily exercised by engineers and soil consulting firms in similar circumstances including in the services provided and work described above and to provide said services and perform said work in a fair and reasonable manner.

90.     There existed numerous defects and deficiencies in the design and construction of the Facility.

14

91.     GeoStructures performed and provided the services and work and owed Plaintiffs a duty to exercise that degree of reasonable care that ordinarily would be exercised by ordinary, prudent persons in similar circumstances while providing said work and services.

92.     As a direct, proximate and foreseeable result of the negligence of GeoStructures, , the Plaintiffs have been injured in that portions of the Facility and/or its subcomponents that incurred and sustained damages including, but not limited, the substantial expenses and costs incurred to repair and/or replace the defects and deficiencies.

WHEREFORE, Plaintiffs demand judgment against GeoStructures, jointly, severely and in the alternative for compensatory and consequential damages, attorneys' fees, costs, interest and such other relief as the Court deems just and equitable.

## EIGHTH COUNT
### Plaintiffs v. GeoStructures
### (Common Law Indemnification)

93.     Paragraphs 1 through 92 are repeated as though fully set forth at length herein.

94.     Plaintiffs assert that the damages sustained by the Plaintiffs were the proximate result of the negligence, wrongdoing and/or defective workmanship and products and materials provided by GeoStructures, which negligence, wrongdoing and/or defective working material were the primary and active cause of the Plaintiffs' damages.

95.     Plaintiffs are entitled to common law indemnification from GeoStructures in an amount in excess of $15,000,000.00 plus attorneys' fees and costs as a result of its wrongdoing.

## NINTH COUNT
### Plaintiffs v. John Does 1 – 10 and ABC Companies 1 – 10
### (Negligence/Professional Malpractice)

96.     Paragraphs 1 through 95 are repeated as though fully set forth at length herein.

97.     John Does 1 – 10 and ABC Companies 1 – 10  provided general contracting, supervisory, site management, construction, installation, oversight, and related services and/or

work and/or goods and/or materials with regard to the development and construction of the Facility including for purposes of construction and installation of the three digester tanks and one buffer tank, and owed the Plaintiffs a duty to exercise that degree of reasonable care, technical skill, ability, and diligence ordinarily exercised by entities and persons who perform or provide said services, work, goods, and/or materials in similar circumstances including in the services, work, goods, and/or materials described above and to do so in a fair and reasonable manner.

98.     There existed numerous defects and deficiencies in the design and construction of the Facility.

99.     John Does 1 – 10 and ABC Companies 1 – 10  performed and provided the services, work, goods, and/or materials described above and owed Plaintiffs a duty to exercise that degree of reasonable care that ordinarily would be exercised by ordinary, prudent persons in similar circumstances while performing and/or providing said services, work, goods, and/or materials.

100.     As a direct, proximate and foreseeable result of the negligence of John Does 1 – 10 and ABC Companies 1 – 10, the Plaintiffs have been injured in that portions of the Facility and/or its subcomponents that incurred and sustained damages including, but not limited, the substantial expenses and costs incurred to repair and/or replace the defects and deficiencies.

WHEREFORE, Plaintiffs demand judgment against  John Does 1 – 10 and ABC Companies 1 – 10,  jointly, severely and in the alternative for compensatory and consequential damages, attorneys' fees, costs, interest and such other relief as the Court deems just and equitable.

### TENTH COUNT
### Plaintiffs v. John Does 1 – 10 and ABC Companies 1 – 10
### (Common Law Indemnification)

101.     Paragraphs 1 through 100 are repeated as though fully set forth at length herein.

102.    Plaintiffs assert that the damages sustained by the Plaintiffs were the proximate result of the negligence, wrongdoing and/or defective or deficient service, workmanship, goods and/or materials performed and/or provided by John Does 1 – 10 and ABC Companies 1 – 10, which negligence, wrongdoing and/or deficient or defective goods and/or materials the primary and active cause of the Plaintiffs' damages.

103.    Plaintiffs are entitled to common law indemnification from John Does 1 – 10 and ABC Companies 1 – 10 in an amount in excess of $15,000,000.00 plus attorneys' fees and costs as a result of its wrongdoing.

## **DEMAND FOR JUDGMENT**

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

1.     That judgment be entered the Defendants;

2.     That the Defendants be held jointly and severally liable to Plaintiffs to the fullest extent allowed by law;

3.     For an award damages in excess of $15,000,000.00 according to Plaintiffs' proof at trial;

4.     For an award of attorney's fees to the fullest extent allowed by law ;

5.     For and award of the costs of suit; and

6.     For such other and further relief to which Plaintiff may be justly entitled.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury as to all issues so triable raised herein.

COZEN O'CONNOR PC


BY: _____
        Daniel C. Theveny, Esq.
        New Jersey Bar No.  046701984
        Mark M. Mullen, Esq.
        (*pro hac vice*)
        Cozen O'Connor
        Suite 2800
        1650 Market Street
        Philadelphia PA 19103
        (215) 665-4194
        (215) 665-2091
        dtheveny@cozen.com
        mmullen@cozen.com
        Attorneys for Plaintiffs Steadfast
        Insurance Company and Zurich American
        Insurance Company


THE MILUN LAW FIRM, LLC


BY: /s/ Ryan Milun _____
        Ryan Milun, Esq.
        New Jersey Bar No. 043412006
        Cranford Business Park
        20 Commerce Drive, Suite 135
        Cranford, New Jersey 07016
        862-702-5010 ext. 1001
        Ryan.milun@milunlaw.com
        Attorneys for Plaintiff Symbiont Science,
        Engineering and Construction, LLC.

EXHIBIT "A"



**SYMBIONT® DESIGN-BUILD, LLC
SUBCONSULTANT
PROFESSIONAL SERVICES AGREEMENT**

THIS AGREEMENT is entered into this 8th day of February, 2018, by and between Symbiont Design-Build, LLC (Symbiont) and Ground Improvement Services, Inc. (Subconsultant).

WHEREAS, Symbiont has entered into a written agreement, (the Contract) with Trenton Biogas, LLC (the Owner) for Digester Foundation Design and Permitting Services (the Project).

WHEREAS, Subconsultant represents that it can provide soil improvement design services, described in the Scope of Work of Attachment 1.

Symbiont and the Subconsultant have agreed that the Subconsultant will perform the following services, which are part of the Contract identified above. The services covered by this Agreement will be performed in accordance with the provisions included within this form and any attachments or schedules.

**Article 1. Scope of Work**

Subconsultant shall perform the services, specified in the Scope of Work section of Attachment 1, which are reasonably necessary and appropriate for the effective and prompt fulfillment of the Subconsultant's obligations under this Agreement. The relationship between the Subconsultant and Symbiont created under this Agreement is that of principal and independent contractor. Services provided by the Subconsultant shall be subject to the provisions of this Agreement including these general conditions, and supplemental conditions incorporated herein, and any written amendments agreed to by both parties.

Symbiont may adjust the Scope of Work by either adding to or deleting from the services to be performed. If such adjustment increases or decreases the cost or time required for the Subconsultant's Scope of Work, adjusted compensation and/or time will be mutually agreed upon in writing. Additional services provided by the Subconsultant will be entitled to additional compensation or extension of time only as authorized in writing by Symbiont. (See Article 24. Change Orders.)

**Article 2. Compensation**

Symbiont shall pay the Subconsultant for work performed under this Agreement in accordance with the provisions described herein and in the Compensation section of Attachment 1.

Subconsultant shall submit invoices to Symbiont in accordance with the Compensation section of Attachment 1 and no more frequently than monthly unless called for in Attachment 1. Invoices shall be submitted to the attention of Symbiont's project manager indicating the project number noted on Attachment 1 at the following address:

Symbiont
6737 West Washington Street, Suite 3440
Milwaukee, Wisconsin 53214

Following Owner's payment to Symbiont, payment will be made by Symbiont to Subconsultant within 15 days for the approved invoice amount. Subconsultant invoices received after the 5th of the month will not be invoiced to Owner until the middle of the following month, which may result in delay in payment. If Symbiont objects to all or any portion of an invoice, Symbiont shall so notify the Subcontractor within fourteen (14) calendar days of the invoice date, identify the cause of disagreement, and pay when due that portion of the invoice, if any, not in dispute. In the event that Symbiont and the Subconsultant cannot resolve the dispute regarding invoiced amounts within thirty (30) days (or in a time frame mutually agreed to by both parties) after receipt by the Subconsultant of the aforementioned notice, the dispute shall be submitted to dispute resolution pursuant to Article 11, below.

Symbiont may, at its sole discretion, withhold payment to Subconsultant for failure of Subconsultant to provide a Certificate of Insurance pursuant to Article 13 below. Symbiont may withhold or offset payment to Subconsultant for failure to provide all lien waivers and other documents pursuant to Article 16 below.



**Article 3.  Confidentiality**

Symbiont and Subconsultant shall hold confidential all business or technical information obtained from the other or its affiliates or Client/Owner under this Agreement for a period of five (5) years after obtaining such information, and during that period shall not disclose such information without the disclosing party's consent except to the extent required for (1) performance of services under this Agreement; (2) compliance with professional standards of conduct for preservation of the public safety, health and welfare; (3) compliance with any law, regulation, ordinance, subpoena, court order or governmental request; or (4) protection of the disclosing party against claims or liabilities arising from performance of services under this Agreement.  In the event disclosure may be required for any of the foregoing reasons, the disclosing party will, except where immediate

notification is required by law or regulation or is, in the judgment of Symbiont's counsel required to limit Symbiont's liability, notify the other party in advance of disclosure.  The parties' obligations hereunder shall not apply to information in the public domain or information lawfully acquired on a non-confidential basis from others.

**Article 4.  Independent Contractor Relationship**

The Subconsultant shall serve as an independent consultant to Symbiont and shall have control over and be responsible for the means and methods for providing services under this Agreement.  Nothing contained in this Agreement will create any contractual relationship between the Owner and Subconsultant.

The Subconsultant acknowledges and agrees that it will not be an agent of Symbiont and will not have nor represent or hold itself, or allow any of its employees, agents, or Subconsultants to represent or hold itself or himself, out as having authority to bind Symbiont or to incur any obligation whatsoever on behalf of Symbiont.  Symbiont shall not be liable to any party in any way for any engagement, obligation, commitment, contract, representation or transaction or any act or omission to act of the Subconsultant as provided in this Agreement.

**Article 5.  Representation and Warranty**

The Subconsultant represents and warrants to Symbiont that the Subconsultant is experienced in the provision of the services to be performed under this Agreement and that such services shall be of a quality and a type usually and customarily provided by Subconsultants performing similar services in and around the locale of the project site.

If under this Agreement the Subconsultant performs any design services, Subconsultant represents and warrants to Symbiont that such design services shall be performed by and/or under the direction of an appropriately registered professional engineer or architect licensed to practice in the state of the subject project.  The registered professional shall, upon completion of the design, stamp and certify all plans, specifications, calculations, etc. to certify his or her professional role in the project.

**Article 6.  Timeliness of Performance**

The Subconsultant acknowledges that time is of the essence in completing its services under this Agreement.

**Article 7.  Force Majeure**

Neither party to this Agreement will be liable to the other party for delays in performing the Scope of Work, or for the direct or indirect cost resulting from such delays, that may result from labor strikes, riots, war, acts of governmental authorities, extraordinary weather conditions or other natural catastrophe, or any other cause beyond the reasonable control or contemplation of either party.

In the event either party to the Agreement has knowledge of any actual or potential delay, that party shall notify the other party in writing of such cases in delay and its probable extent.

**Article 8.  Suspension**

The Subconsultant will, upon ten (10) days written notice from Symbiont suspend, delay or interrupt all or a part of the Scope of Work.  In such event, the Subconsultant will resume the Scope of Work upon written notice from Symbiont and an appropriate extension of time shall be mutually agreed upon and added to the Subconsultant's time of performance.



**Article 9.  Termination**

Symbiont will have the right to immediately terminate this Subconsultant Agreement at its discretion upon written notice.

This Agreement may be immediately terminated by either party upon written notice in the event of substantial failure by the other party to perform in accordance with the terms hereof.  After termination, Subconsultant will be paidreimbursed for services rendered and reimbursed for all necessary expenses incurred to the termination date upon submission to Symbiont of detailed supporting invoices.  Subconsultant will not be entitled to profit or other compensation on services not performed.

Either party may terminate this Agreement immediately upon written notice to the other party in the event that the other party becomes insolvent, files a petition in bankruptcy, is adjudicated bankrupt, has an assignee, referee, receiver or trustee appointed in any creditor action, has a petition in bankruptcy filed against it which is not vacated within thirty (30) days or suffers any analogous action.

**Article 10.  Notice to Parties**

All notices required or permitted under this Agreement shall be in writing and shall be made to the parties' usual place of business.

**Article 11.  Dispute Resolution**

Symbiont and Subconsultant shall provide written notice of a dispute within a reasonable time after the event giving rise to the dispute.  Symbiont and Subconsultant agree to negotiate any dispute between them in good faith for a period of 30 days following such notice.  Symbiont and Subconsultant may agree to submit any dispute to mediation, but such mediation shall not be required as a prerequisite to initiating a lawsuit to enforce this Agreement.  Either party shall have the right to litigate the claim, dispute or other matter in question in any state or federal court located in New JerseyMilwaukee County, Wisconsin.  In connection therewith, each party agrees to submit to the jurisdiction of such court.

In the event that legal action is brought by either party against the other in the Courts (including action to enforce or interpret any aspect of this agreement), the prevailing party shall be reimbursed by the other for the prevailing party's legal costs, in addition to whatever other judgments or settlement sums, if any, may be due.  Such legal costs shall include, but not be limited to, reasonable attorney's fees, court costs, expert witness fees, and other documents expenses, in addition to any other relief to which it may be entitled.

Neither party will be responsible to the other for special or consequential damages including but not limited to, loss of profits, loss of investment or business interruption.  The Subconsultant also agrees to seek recourse only against Symbiont and not its officers, employees, directors, or shareholders.

**Article 12.  Choice of Law**

This Agreement shall be governed and construed in accordance with the laws of the State of New Jersey Wisconsin, without reference to conflicts of law principles.  Each party hereto consents to the exclusive jurisdiction of the state and federal courts located in Milwaukee County, Wisconsin for any actions, suits or proceedings arising out of or relating to this Agreement.

**Article 13.  Insurance**

The Subconsultant declares and shall submit an insurance certificate that it maintains the following insurance coverage:

    A.  Workers' Compensation:
        of a form and in an amount as required by state law

    B.  Employer's Liability:
        $1,000,000 per accident
        $1,000,000 disease, policy limit
        $1,000,000 disease, each employee



C. Commercial General Liability (bodily injury and property damage – combined single limit):
$1,000,000 per occurrence
$2,000,000 aggregate

D. Contractor's Pollution Liability:
$1,000,000 per occurrence

E. Automobile Liability (owned, non-owned and hired vehicles):
$1,000,000 combined single limit

F. Professional Liability:
$1,000,000 per occurrence

G. Excess/Umbrella Liability:
$2,000,000 per occurrence
$2,000,000 aggregate

Symbiont and Owner shall be named as an additional insured with respect to Subconsultant's insurance policies described in lines C, D, E, and G above and Subconsultant waives subrogation against Owner and Symbiont as to all policies above and the Subconsultant shall furnish Symbiont with a Certificate evidencing the same.

All insurance certificates shall state that the insurance carrier will give Symbiont thirty (30) days notice of any cancellation or material change of the policies.

Any deductibles or self-insured retentions must be declared to and approved by Symbiont. At the option of Symbiont, either: the insurer shall reduce to a maximum of $50,000 or eliminate such deductibles or self-insured retentions as respects Symbiont, its officials and employees or provide satisfactory financial evidence to Symbiont of the Subconsultant's ability to fund the deductible amount if necessary. Any self-insured retention or deductible amount on the policy shall not reduce the amount of collectible limits of liability.

If any of the aforementioned insurance policies are written on a claims-made basis, the Subconsultant warrants that continuous coverage will be maintained or an extended discovery period will be exercised for a period of one year five years beginning from the time the work under this contract is completed.

The insurance companies providing the coverage shall maintain a minimum A.M. Best financial rating of at least A —.

Subconsultant agrees to indemnify and save Symbiont harmless from and against all liability, loss or expense (including costs and attorneys' fees) arising out of or in consequence of Subconsultant's failure to obtain the required coverages or to meet the other insurance requirements of this Agreement.

Neither Symbiont's failure to require or to insist upon certificates or other evidence of insurance, nor Symbiont's acceptance of a certificate or other evidence of insurance showing a variance from the specified coverage, changes or waives Subconsultant's obligation to comply with the insurance specifications of this Agreement.

Symbiont may, at its sole discretion, withhold payment to Subconsultant for failure of to provide a Certificate of Insurance. Symbiont's payment to Subconsultant shall not change or waive Subconsultant's obligation to comply with the insurance specifications of this Agreement.

**Article 14. Indemnification**

Symbiont and the Subconsultant mutually agree, to the fullest extent permitted by law, to indemnify and hold each other harmless from any and all damage, liability or cost (including reasonable attorneys' fees and costs of defense) arising from their own negligent acts, errors or omissions in the performance of their services/work under this Agreement, to the extent that each party is responsible for such damages and losses on a comparative basis of fault.

Subconsultant agrees, to the fullest extent permitted by law, to indemnify and hold Symbiont harmless from any and all damage, liability or cost (including reasonable attorneys' fees and costs of defense) arising from any lower-tier subconsultant's or subcontractor's negligent acts, errors or omissions in the performance of their services/work under this Agreement, to the extent that such lower-tier subconsultant or subcontractor is responsible for such damages and losses.



**FORM SDB-3 02-2016**

**Article 15. Safety**

Subconsultant shall take reasonable precautions to perform the Scope of Work in a safe manner and is responsible for initiating, maintaining, and supervising all safety precautions and programs in connection with the Subconsultant's work. Subconsultant will be solely responsible for working conditions on those portions of the Project job site reasonably within Subconsultant's work area, including the safety of all persons and property during performance of the Scope of Work, in addition to providing any and all safety equipment or articles necessary to protect its employees and agents and to comply with applicable OSHA regulations and requirements of the Owner of the Project job site. Any monitoring of Subconsultant's procedures conducted by Symbiont will not include a review of the adequacy of Subconsultant's safety measures in, on, adjacent to, or near any Project job site. Symbiont's responsibility for Project job site safety is limited solely to its own employees and the provision of appropriate training, supervision and personal protective equipment for those employees.

An expression of concern by Symbiont regarding the Subconsultant's safety practices shall not be construed as usurping the responsibility of the Subconsultant for the safety of the Subconsultant's work.

**Article 16. Assignment/Lower-Tier Subconsultants**

This Agreement and the rights and duties hereunder shall not be assigned, subcontracted, or transferred by Subconsultant, in whole or in part, without Symbiont's prior written approval. Subconsultant shall inform Symbiont in writing of the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for any portion of the work subject to this Agreement. If Symbiont objects to any lower-tier subconsultant or supplier, such objection will be given in writing to Subconsultant within a reasonable period of time, specifying the basis for the objection. Subconsultant shall not contract with a lower-tier subconsultant or supplier reasonably objected to by Symbiont.

Prior to Symbiont's payment of progress payments and/or the final payment to Subconsultant, Subconsultant shall deliver proof satisfactory to Symbiont of full payment to all lower-tier subconsultants, suppliers, and for all labor, materials, supplies, machinery and equipment furnished for or used in performance of the Scope of Work identified in this Agreement. Such proof will include all necessary releases or waivers of liens supported by affidavits, all satisfactory to Symbiont, establishing that all liens and rights to claim liens which could arise out of performance of this Agreement, have been waived.

So long as Subcontractor has been paid on a timely basis for un-contested completed work. Subconsultant shall take all actions within its control (including the execution, acknowledgement, delivery and filing of such waivers, releases and other documents) to prevent any mechanics' or materialmen's liens or any other liens or encumbrances from being filed in respect of or placed upon any real property or improvements owned or leased by Symbiont or Owner as a result of or in connection with any work performed by or any other action or omission on the part of Subconsultant or any lower-tier subconsultants or suppliers or other person claiming by, through or under Subconsultant including, but not limited to, any liens or encumbrances arising by reason of the construction, use, occupancy, maintenance, repair or rebuilding of any such property or improvements or the furnishing of any labor, materials or supplies. If, notwithstanding the immediately preceding sentence, any mechanics' or materialmen's lien or other lien or encumbrance is filed in respect of or placed upon such property or improvements and if Subconsultant does not cause such lien or encumbrance to be fully and effectively released and discharged, or does not cause such lien or encumbrance to be bonded over in a manner acceptable to Symbiont and Owner, Symbiont shall be entitled, without prejudice to any other rights or remedies available to it, to pay directly to the holder of such lien or encumbrance all sums necessary to obtain its immediate release and discharge and to credit all sums so paid against any amount due or to become due to Subconsultant under or in connection with this Agreement or any other agreement with Subconsultant.

**Article 17. Communication with Owner**

All of the Subconsultant's written or verbal communication with or to the Owner, or with federal, state, or local agencies, relative to work under this Agreement must be through or with knowledge of Symbiont.

**Article 18. Copies of Data**

Unless otherwise called for in the Scope of Work, one legible copy each of all notes, field notes, drawings, prints, and plans prepared under the terms of the Subconsulting Agreement shall be delivered by the Subconsultant to Symbiont upon completion of the Scope of Work or termination of the Agreement.



**Article 19.  Soliciting Employment**

Neither party to this Subconsultant Agreement shall solicit an employee of the other party, nor hire or make an offer of employment to an employee of the other party, without prior written consent of the other party, during the time this Subconsultant Agreement is in effect.

**Article 20.  Waiver**

No waiver by Symbiont of any term or condition set forth herein, whether by conduct or otherwise, in any one or more instances, shall be deemed or construed as a further or continuing waiver of any such term, condition or breach or a waiver of any other term, condition or breach.

**Article 21.  Headings**

The subject headings in this Agreement are for convenience only and are not determinative of the substance of the subject clause.

**Article 22.  Entire Agreement**

The parties agree that this Agreement, together with Attachment 1, represents the sole and entire integrated Agreement of the parties with respect to the project and supersedes all prior communications, negotiations, representations, quotations, offers or agreements, either written or oral between the parties hereto, with respect to the subject matter hereof, and no agreement or understanding varying or extending this Agreement shall be binding upon either Party, other than by a written agreement signed by both Subconsultant and Symbiont.  If additional documents represent the agreement of the parties, such documents must be itemized, referencing this Article 22, in Attachment 1.

**Article 23.  Severability**

If any provision or part of a provision of this Agreement is declared to be invalid by any tribunal of competent jurisdiction, such part shall be deemed automatically adjusted, if possible, to conform to the requirements for validity, but if such adjustment is not possible, it shall be deemed deleted from this Agreement as though it had never been included herein. In either case, the balance of any such provision and of this Agreement shall remain in full force and effect.

**Article 24.  Change Orders**

Any amendments to this Agreement shall be executed by means of a written change order, signed by the Subconsultant and Symbiont.  Changes to the Agreement will not become effective until the change order has been signed by both parties.  The change order will document the specific changes to the Agreement along with any resulting adjustment in cost and/or schedule.

IN WITNESS WHEREOF, the parties have executed this Agreement including Attachment 1, which includes a description of the scope of work, schedule, method of compensation, and Supplemental Terms and Conditions of Agreement (if any), and is incorporated by reference into these Terms and Conditions of Agreement.  This Agreement may be executed in counterparts, each of which shall constitute an original, but both of which when taken together shall constitute one and the same agreement.  The parties agree that a counterpart of this Agreement may be executed by a party and then delivered to the other party by facsimile or other electronic means, and such facsimile or other electronic copy will constitute an original counterpart.  The signatories below represent that they are duly authorized by the business entities they represent to sign this Agreement.  The effective date of this Agreement is the later of the signature dates below.



**FORM SDB-3 02-2016**

Subconsultant: Ground Improvement Services, Inc.

Name: Kenneth J. Leahy | Chief Operating Officer | 2/8/18
Title | Date

Symbiont Design-Build, LLC:

Name: | Vice President | 02/08/18
Title | Date

|

P:\Treton Biogas LLC\DB180999 Digester Design & Permitting\A3-O2-DB180999-229-GIS.docx
Q:\Contract Administration\Symbiont DB Subconsultant 02-2016

Page 7 of 9



FORM SDB-3 02-2016

**ATTACHMENT 1**
**TO SYMBIONT® DESIGN-BUILD, LLC**
**SUBCONSULTANT**
**PROFESSIONAL SERVICES AGREEMENT**

| | |
|---|---|
| Project Name | Trenton Biogas<br>Digester Foundation Design and Permitting Assistance |
| Project No. | DB180999 |
| Subcontractor | Ground Improvement Services, Inc.<br>PO Box 918<br>Purcellville, VA 20134<br>Steward Station, PM<br>703-869-7495<br>Attn: Kurt Levins, P.E.<br>862-763-0468 |
| Owner | Trenton Biogas, LLC |
| Site Location | Trenton Biogas<br>1600 Lamberton Road<br>Trenton, NJ 08611 |
| Scope of Work | Scope of work shall consist of soil improvement system design services as summarized in Ground Improvement Services, Inc. quote dated 01/30/18 for three (3) digester tanks and one buffer tank for the proposed Trenton Biogas Facility in Trenton, NJ. All design documents shall be stamped by a registered professional engineer licensed in the state of New Jersey. The deliverable for this project shall be stamped design drawings and calculations for use by the Owner to obtain a construction permit from the local permitting authority. |
| Compensation | Lump sum fee of $47,800<br><br>Provide invoices to the attention of Brian Till that identify the Symbiont project number DB180999 and delineates the scope of work provided. |
| Schedule | Time is of the essence. All design work must be completed within two weeks of receipt of final design loads. |
| Supplemental Conditions | 1. The Owner is an intended third-party beneficiary to this Agreement. This Agreement is assignable to Owner, without further consent or approval by Subconsultant, upon Owner's written request following default by Symbiont or termination or expiration of the Contract between Owner and Symbiont.<br>2. Subconsultant shall enter into a new contract directly with the Owner on the same terms and conditions as this Agreement in the event that any trustee in bankruptcy for Symbiont rejects this Agreement, or the Subconsultant terminates this Agreement as a result of the bankruptcy of Symbiont. |



|  |  |
|---|---|
|  | 3. Subconsultant shall provide reasonable cooperation and further assurances in connection with Owner's efforts to obtain debt and/or equity financing for the Project facility as Owner shall reasonably request and shall use commercially reasonable efforts to cause its lower-tier subcontractors to do the same. Without limiting the foregoing, within twenty (20) business days after Owner's written request, Subconsultant shall execute and deliver to Owner a written consent in a form satisfactory to Owner, and such consents to assignment and related agreements as shall be typical in project finance transactions on the form customarily used by such financing parties, for the benefit of Owner's financing parties, in either case together with such changes as the financing parties shall reasonably request. Any costs (including reasonable attorney's fees) incurred by Subconsultant in connection with complying with the terms of this provision, including any legal opinions required to support any such financing party consents, shall be at Owner's costs and shall be in addition to the Compensation in Attachment 1 of this Agreement. <br> 4. Article 16 – Insurance. Item F, Professional Liability. Subconsultant shall provide an insurance certificate with $5,000,000 per occurrence of Professional Liability Insurance. |

EXHIBIT "B"

### SECTION 01 10 29 - SCOPE OF WORK – SOIL IMPROVEMENTS

**PART 1  GENERAL**

**1.1      PROJECT INFORMATION**

1.1.1    Project Name: Trenton Biogas

1.1.2    Owner's Name: Trenton Biogas LLC

1.1.3    Engineer's Name: Amec Foster Wheeler

1.1.4    Construction Manager's Name: Amec Foster Wheeler

**1.2      BACKGROUND**

1.2.1    Trenton Biogas LLC is upgrading the existing (currently not being used) Mercer County Regional Sludge Management Facility to a food product to energy facility. The proposed facility will use food products, pharmaceutical grade alcohols, and glycerin to produce methane, compost, and fertilizer.  The facility is located at 1600 Lamberton Road, Trenton, NJ.

1.2.2    The site is located on a site with marginal soils deemed too inconsistent to support the three 1.3M gallon digester tanks and one buffer tank.

**PART 2  DESCRIPTION OF WORK**

**2.1      SUMMARY OF WORK**

2.1.1    Provide and install soil improvement system to improve soil bearing capacity under three digester tanks (T-12100, T-12200, T-12300) and one buffer tank (T-10400) foundations. Reference drawings D-000-M-100 and D-020-S-100.

2.1.2    Soil improvement system may consist of the following:

2.1.2.1  GeoStructure Inc.: Geo-Piers

2.1.2.2  Hayward Baker: Vibro-Piers or Vibro Concrete Columns

2.1.2.3  Menard Group USA: Vibro-Stone Columns

2.1.2.4  Or Owner approved equivalent soil improvement system.

2.1.3    Soil improvement system shall be designed to comply with Performance Design Criteria listed on the D-020-S-100 drawing and the Geotechnical Engineering Evaluation Report dated June 29, 2016 prepared by GZA GeoEnvironmental Inc.  See the report for information on soils and overall site condition.

2.1.4    Soil improvement Criteria:

2.1.4.1  Allowable Soil Bearing Pressure for gravity loads: 4,600 PSF minimum.

2.1.4.2  Allowable Soil Bearing Pressure for gravity plus seismic loads: 7,600 PSF minimum.

2.1.4.3  Maximum long-term settlement under tanks: up to 2-inches.

2.1.4.4  Maximum differential settlement: ½-inch.

2.1.5    Soil improvement contractor shall perform condition survey of the existing building and of the Waste Water Treatment tanks to the north to monitor potential detrimental effects to structures from soil improvement system installation.  Submit condition survey plan to Engineer prior to starting work.

2.1.6    See drawing D-020-S-100 for approximate area of soil improvement required and drawing D-020-S-500 for tank foundation plans and details.

2.1.7    Soil improvement system shall have drawings and calculations prepared, sealed and signed by a registered professional licensed in the State of New Jersey.

2.1.8    Soil improvement system submittal shall be submitted to Engineer for review prior to installation.

2.1.9    See drawing D-000-S-010 for Structural General Notes, D-000-S-012 for Special Inspections required and drawings D-000-S-100 and D-000-S-101 for overall site layout and area plans.

**2.2** **WORK NOT INCLUDED**

2.2.1    Reinforced concrete work.

2.2.2    Helical anchors.

**PART 3 EXECUTION**

**3.1** **CONTRACTOR RESPONSIBILITIES**

3.1.1    Subcontractor will be responsible for the supply of labor, materials, consumables, equipment, tools, QA/QC, insurance, supervision and project management as required for the scope of work.

3.1.2    Work shall be performed in accordance with the referenced project documents, project schedule, special conditions and this Scope of Work.

3.1.3    The Scope of Work is for a complete job and encompasses all facets of the work.  Any complementary work necessary to complete the job is also included. These include but are not limited to:

3.1.4    Mobilization/Demobilization

3.1.5    Evaluating existing conditions.

3.1.6    Disposal of any spoils.

3.1.7    Location of all underground utilities in the area of work.

3.1.8    Coordination with underground utilities and electrical grounding requirements.

3.1.9    Code requirements for working near existing roadway and wetlands.

3.1.10   Safety requirements for working near active underground electrical duct banks.

3.1.11   Quality control testing during placement of soil improvements.

3.1.12   Quality assurance coordination with Owner Inspection Agencies.

3.1.13   Subcontractor is responsible for all weather protection;

3.1.14   Report Progress – Quantity complete on a weekly basis.

3.1.15   Quality control plan and procedures.

3.1.16   Submittals as called out in project drawings and specifications.

3.1.17   Clean up of all waste generated by this scope of work.

**PART 4 DOCUMENT LIST**

**4.1** **DRAWINGS**

4.1.1    D-000-S-010, D-000-S-011, D-000-S-012, D-000-S-100, D-000-S-101, D-000-S-500, D-020-S-100, D-020-S-101, D-020-S-500,

4.1.2    General Arrangement Drawings.

**4.2** **OTHER DOCUMENTS**

4.2.1    Geotechnical Engineering Evaluation Report dated June 29, 2016 prepared by GZA GeoEnvironmental Inc.

**END OF SECTION 01 10 29**

EXHIBIT "C"

# SYMBIONT/SUBCONTRACTOR
# CHANGE ORDER



DISTRIBUTION TO:

| | |
|---|---|
| Symbiont PM | _____ |
| Contractor | _____ |
| Central File | _____ |

| | | | |
|---|---|---|---|
| **PROJECT:** | Trenton Biogas | CHANGE ORDER NUMBER: | 1 |
| (Name & Address) | | | |
| | 1600 Lamberton Road | INITIATION DATE: | 5/30/2018 |
| | Trenton, NJ 08611 | PROJECT MANAGER: | Brian Till |
| **TO CONTRACTOR:** | Ground Improvement Services | CONTRACT SERVICES: | Soil Improvement |
| (Name & Address) | | | |
| | PO Box 918 | CONTRACT DATE: | 2/8/2015 |
| | Purceellville, VA 20134 | | |

You are directed to make the following changes in this Contract:

Grouted impact pier foundation system construction per Ground Improvement Services design documents dated 4/4/18 and Ground Improvement Services proposal No. 7820 RI dated 1/20/18.  Scope of work includes mobilization, modulus test, three (3) digester RI elements, and one (1) buffer tank RI elements.

Not valid until signed by the Symbiont Representative and CONTRACTOR.

CONTRACTOR agrees that this Change Order includes any and all costs associated with or resulting from the change ordered herein, including all impacts, delays, and accelerated costs.  Other than the dollar amount and time allowance listed above, there shall be no other dollar or time compensation as a result of this Change Order.

| | | |
|---|---|---|
| The original Contract Price………………………………………………………………… | $ | 47,800.00 |
| Net change by previously authorized Change Orders……………………………………… | $ | - |
| Net increase / (decrease) of this Change Order…………………………………………… | $ | 551,110.00 |
| Revised Contract Price including this Change Order……………………………………… | $ | 598,910.00 |
| The Contract Time will be (increased)/(decreased) by…………………………………… | N/A | Days |
| The revised Date of Substantial Completion is…………………………………………… | N/A | |

**Ground Improvement Services**
CONTRACTOR (Company Name)

PO Box 918
Purcellville, VA 20134
ADDRESS

**SYMBIONT**

6737 West Washington Street, Suite 3440
West Allis, Wisconsin 53214
414-291-8840
Fax: 414-291-8841
ADDRESS

By (Signature)                    DATE

*Brian Till*  05/30/18
By (Signature)                    DATE

TRUSTED FOR GOOD REASON.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SYMBIONT SCIENCE, ENGINEERING AND CONSTRUCTION, INC.; ZURICH AMERICAN INSURANCE COMPANY a/s/o Symbiont Science, Engineering and Construction, Inc.; AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY, a/s/o Symbiont Science, Engineering and Construction, Inc. and STEADFAST INSURANCE COMPANY a/s/o Symbiont Science, Engineering and Construction, Inc., <br><br> Plaintiffs <br><br> vs. <br><br> GROUND IMPROVEMENT SERVICES, INC.; JOHN DOES 1-10, (fictitious parties) and ABC COMPANIES 1-10 (fictitious parties); GEOSTRUCTURES OF VIRGINIA, INC. <br><br> Defendants. | CIVIL ACTION NO. 3:22-04905 <br><br> **CERTIFICATE OF FILING AND SERVICE** |

I hereby certify that on October 12, 2022, a copy of the foregoing which was

electronically filed and served by mail on anyone unable to accept electronic filing. Notice of

this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system

or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic

Filing. Parties may access this filing through the Court's CM/ECF System.


*s/Daniel C. Theveny*
 Daniel C. Theveny (046701984)